UNITED STATES *v.* OUTERBRIDGE & Co. (No. 1607).[1]

1. CONSTRUCTION—SUBSECTION 5 OF PARAGRAPH J OF SECTION 4, TARIFF ACT OF 1913.
    The obvious intent of subsection 5 of paragraph J of section 4, tariff act of 1913, was to favor the shipping industry of this country, and whatever of ambiguity may be found in it must be resolved so as to give effect to that intention. The interchangeable use in the subsection of the words "materials" and "articles" denies to it uniform expression unless "articles" be construed to mean such articles as are materials used in further manufacture. To hold that a completed marine engine is "materials" and can be imported free of duty would defeat the obvious intent of the subsection.

2. IMPORTATION OF ALL PARTS IS IMPORTATION OF WHOLE.
    The importation in one shipment of all the essential parts of a marine engine, though such parts be unassembled, is an importation of a marine engine.

3. MARINE ENGINE—NONESSENTIAL PARTS.
    All the parts of a marine engine except bushes, filter box, connecting pipe from receiver to condenser, and bolts to fasten it to its foundation constitute a complete marine engine.

4. MARINE ENGINE, HOW DUTIABLE.
    A marine engine is not admissible free of duty under subsection 5 of paragraph J of section 4, tariff act of 1913, as shipbuilding materials or articles, but is dutiable under paragraph 165 as a steam engine.

United States Court of Customs Appeals, May 31, 1916.

APPEAL from Board of United States General Appraisers, Abstract 38248.
[Modified.]

*Bert Hanson.* Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel), for the United States.

*Gerry & Wakefield* for appellees.

[Oral argument February 11, 1916, by Mr. Hanson and Mr. Wakefield.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

DE VRIES, Judge, delivered the opinion of the court:

In December, 1912, the Downey Shipyard & Marine Co., of Brooklyn, N. Y., contracted with the Bermuda Transportation Co., of Ber-

---

[1] Reported in T. D. 36511 (30 Treas. Dec., 1116).

muda, to build for them a steel vessel fully equipped with machinery and general outfit. The boat was constructed at the Downey Ship-yard & Marine Co.'s yards at Brooklyn, N. Y., and was named the *Princess*. The Bermuda Transportation Co. is a corporation organized under the laws of Bermuda. The merchandise here in question was ordered by the building company from Plenty & Son (Ltd.), Newbury, England, and duly imported at the port of New York and made a part of the said boat. A statement of the items is in the record. (Record, p. 48.) While there are numerous questions in this appeal as to compliance with the regulations, the repeal of statutes *in pari materia,* and of evidence, in the view taken of the case by the court these questions are subsidiary to and decided by the main issue, which is, whether or not the imported merchandise falls within the provisions of subsection 5 of paragraph J of section 4 of the act of October 3, 1913, reading:

J (subsection 5). That all materials of foreign production which may be necessary for the construction of naval vessels or other vessels of the United States, vessels built in the United States for foreign account and ownership, or for the purpose of being employed in the foreign or domestic trade, and all such materials necessary for the building of their machinery, and all articles necessary for their outfit and equipment, may be imported in bond under such regulations as the Secretary of the Treasury may prescribe; and upon proof that such materials have been used for such purposes no duties shall be paid thereon.

The relevancy of subsection 6 of paragraph J of section 4 of the act of October 3, 1913, is also discussed in the briefs. Inasmuch, however, as the record clearly shows that the *Princess* was owned and used by a foreign corporation and was not owned or registered under the laws of the United States, the terms of that subsection exclude its relevancy.

Owing to some apparent confusion as to whether or not said subsection 5 repealed section 5 of the act of August 24, 1912, the board predicated its decision upon that paragraph of the act of 1912, and held the imported merchandise entitled to free entry thereunder.

It seems agreed by all parties herein that if the imported merchandise is entitled to free entry, such must be accorded under the provisions of subsection 5 of paragraph J of section 4 of the act of October 3, 1913, *supra*.

It might be said generally that the invoice included various items some of which entered into the construction of a triple-expansion marine engine and some of which, though ordinarily included within the engine room of a ship, did not enter into the construction of the engine.

The invoice, dated London, England, October 16, 1913, described the importation as follows:

\*          \*          \*          \*          \*          \*          \*

One set $\dfrac{12'', 20'', 32''}{18''}$ triple-expansion marine engines, with air and circulating pumps, steam reversing gear, *all complete*, and packed in five (cgs.) wooden cases.

\*     \*     \*     \*     \*     \*     \*

In an affidavit by the master builder, dated at New York, N. Y., November 17, 1913, the following was declared:

\*     \*     \*     \*     \*     \*     \*

Description of articles: (1) Triple-expansion steam engine *and all its parts*, as specified in shipping specifications hereto attached.

\*     \*     \*     \*     \*     \*     \*

The collector returned that "the within-described merchandise consists of *completed machinery* or mechanism for the propulsion of vessels." Accordingly duty was assessed by the collector upon the entire importation as manufactures of metal under the provisions of paragraph 167 of the said act. Upon protest the Board of General Appraisers reversed the decision of the collector, concluding as follows:

There remains but one question for decision, and that is: Are the articles which are the subject of this protest such as come within the purview of the Panama Canal act? It is contended by the Assistant Attorney General that the material furnished constituted a complete engine. This we think the testimony does not justify. The articles in question we find are such as come within the purview of that law. See Conkey & Co.'s case, G. A. 7668 (T. D. 35086). The protest is sustained and the collector directed to liquidate the entry accordingly.

Subsection 5 of the act of October 3, 1913, *supra,* is not clear and unambiguous. It will be noted that while it provides for "materials" necessary for the building of their machinery, it then provides for "articles" necessary for the outfit and equipment; later, however, providing that such free entry should only be accorded on "proof that such *materials* have been used," etc. This alternative use of the words "articles" and "materials" denies to the paragraph uniform expression unless it be held that the "articles" therein provided for shall be confined to such articles as are materials used in further manufacture. This distinction was observed in Tide Water Oil Co. *v.* United States (171 U. S., 210, 216), wherein the court said:

Ordinarily, the article so manufactured takes a different form, or at least subserves a different purpose from the original materials; and usually it is given a different name. Raw materials may be and often are subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product. Thus, logs are first manufactured into boards, planks, joists, scantlings, etc., and then by entirely different processes are fashioned into boxes, furniture, doors, window sashes, trimmings, and the thousand and one articles manufactured wholly or in part of wood. The steel spring of a watch is made ultimately from iron ore, but by a large number of processes or transformations, each successive step in which is a distinct process of manufacture, and for which the article so manufactured receives a different name.

The material of which each manufacture is formed   \* \* \*   is not necessarily the original raw material,   \* \* \*   but the product of a prior manufacture, the finished product of one manufacture thus becoming the material of the next in rank.

And in United States *v.* Richter (2 Ct. Cust. Appls., 167, 169; T. D. 31680), wherein this court observed:

Ordinarily a manufactured article takes a different form, or at least subserves a purpose different from the original materials out of which it is made, and usually it takes a different name. * * * That does not mean, however, that its usefulness as a material has necessarily ended and that as a manufacture it can not serve the purpose of material for some other manufacture. ,

The court is clearly of the opinion, however, that whatever may be the difficulties of prescribing an exact line of differentiation between materials, articles, and parts as to various possible importations under the paragraph, this case is ruled by certain well-established and clearly pertinent rules of construction.

Cardinally the court must observe and so construe a statute as will *most effectually* carry out the obvious intent of Congress. The obvious intent of Congress herein was to favor the shipbuilding industry of this country by encouraging and giving aid and special concessions under its import laws to that industry. If the court should put the construction upon this paragraph that all *completed* parts of a ship could be imported under this paragraph, it remaining only to assemble them in this country, obviously violence would be done the intention of Congress and our shipyards would become nothing more than assembling plants rather than manufacturing or shipbuilding institutions. The point may be aptly illustrated by the conduct of the great automobile industry of the country, wherein the various parts are manufactured at the home plant and shipped into the various States to assembling plants for business reasons. If we applied that principle of construction to this paragraph all those classes of skilled labor employed in the construction of a ship would not be afforded employment, but there would be employed only those men who could assemble the various parts of a ship. Applied precisely to the question herein, if a completed marine engine can be imported free of duty under this paragraph it would seem to logically follow that a completed hull of a ship could be constructed in a foreign country and imported. The court can not attribute that purpose to Congress which would thus result in destroying rather than benefiting the shipbuilding industry of the country.

Without further attempt at definition or limitation of the terms of the paragraph, it will suffice for this case to decide the question whether or not a triple-expansion marine engine, ordered and imported as hereinbefore stated, was a complete engine. The invoice and affidavit so declared. The collector seems to have so found, at least the collector so held the merchandise dutiable. The Board of General Appraisers took the opposite view. The question is therefore presented for decision by the court, Was there sufficient evidence in the record to justify the Board of General Appraisers in overruling

the decision of the collector? We think not. This question turns upon the single point whether or not the items in the invoice when assembled made a complete triple-expansion marine engine. The theory of the witnesses upon behalf of the importers was that every item of the invoice which went into the engine room was a necessary part of the engine. They went so far as to declare that the pumps for pumping water out of the hold, the propeller shaft which was driven by the engine, the propeller itself, were necessary parts of the engine, and that there being absent from the invoice certain connections between the engine and these remote and subsidiary items, therefore the engine itself was not a complete engine. We think the statement of that position sufficient for its refutal.

There were one or two items the subject of controversy which might present a debatable question. They were, first, that there was no connecting pipe from the low-pressure receiver to the condenser. This is a copper pipe fastened with steel flanges, which were claimed not to be included in the invoice. Secondly, there was no filter box. That article seems to receive water from the pump and distribute it to the boiler—feeds the water to the boiler. It seems to be conceded that the boiler of a marine engine is no part of the engine itself. Wherefore the filter box is not a necessary part. The other items in controversy were such as bolts to fasten the engine to its foundation and to the shafting. The final conclusion of the machinist who installed the items, who was in the employ of the construction company, was in these words:

General Appraiser HAY. Do not speculate; tell us what it was sent over here minus of.—A. There were no bushes, there was no filter box, there is no connecting pipe from the receiver to the condenser.

Q. Is that all?—A. And the bolts to fasten it down to its foundation.

Q. Is that all?—A. Also the bolts to fasten it to the shafts.

Q. Aside from that was it complete?—A. So far as I recollect, yes.

The invoice was for $7,819.74. It consisted of a great number of items. While there is no definite testimony in the record as to the actual cost of these enumerated items the record makes it perfectly obvious that they were unsubstantial and insignificant. Moreover, they do not seem to be an integral part of the engine itself. The testimony makes it perfectly clear that all these items are such as are necessary in adjusting the engine or its parts to its place of final operation, required to be long or short, in one position or another, necessary or unnecessary, according to the final adjustment. The court is, therefore, of the opinion that they were not substantial or even significant parts, if they were parts at all of the engine itself.

While the various parts of the engine were not assembled they were included in the importation, they therefore constituted an entirety and a complete engine. The case in this respect is well

within the decisions.  It was held in United States *v.* Schoverling (146 U. S., 76) that where parts of shotguns were imported on different vessels by different importers, though of the same firm, that they were not dutiable as entireties, completed shotguns, but according to the material of their composition.  It was held, and the point seems settled, in United States *v.* Irwin *et al.* (78 Fed., 799), and in United States *v.* Auto Import Co. (168 Fed., 242), that where several parts of an entirety are included in the same importation to the same importers which when put together constitute a completed article they are dutiable as such article.

The court is of the opinion that each and all of the necessary parts of a completed triple-expansion marine engine were included in this invoice, and that as such a complete engine, which all men know to be the most important machine in the construction and operation of a ship, were herein imported.

It would seem sufficient for the purposes of this case, whatever interpretation may be given the words "materials" or "articles" in other parts of the paragraph, to point out that free entry in such cases as this is accorded by the statute to "such *materials* for the *building* of their machinery."  In this instance not the materials or parts necessary for the *building* of this machine but the complete machine itself was imported, and therefore not entitled to free entry.

The claim is made in the protest that if not entitled to free entry under the provisions of subsection 5 of the act of October 3, 1913, *supra,* the importation is dutiable under paragraph 165 of the act for "all steam engines."  The court is of the opinion that that point is well taken in this case and that it should be so classified.  In that particular and to that extent the decision of the board is reversed. The Government makes no contention as to other items and for that reason the decision of the board, except as herein modified, is affirmed.

*Modified.*