### JOHNSON IRON WORKS (LTD.) v. UNITED STATES (No. 2069).[1]

1. MATERIALS AND MANUFACTURES DISTINGUISHED—SHIPS' PARTS AND MATERIALS.
    An importation of boiler parts lacking such distinctive and important features as furnaces, pipe, stay tubes, boiler plates, and other parts, castings, can not be regarded as an importation of complete boilers in knockdown condition within the meaning of United States v. Outerbridge (7 Ct Cust. Appls., 223; T. D. 36511). Such importations are entitled to entry free of duty under subsection 5, paragraph J, section IV, tariff act of 1913, as materials necessary for the building of the machinery of American vessels, and are not dutiable under paragraph 167 as manufactures of metal.

2. EVIDENCE, PAPERS IN CASE AS.
    While recitals in the papers of the case may be taken as evidence in the absence of any other, they do not estop the importer from showing the facts to the contrary, particularly where he satisfactorily explains the discrepancy.

United States Court of Customs Appeals, February 4, 1921.

APPEAL from Board of United States General Appraisers, Abstract 43345.

[Reversed.]

*Hall, Monroe & Lemann* and *Walter J. Suthon, jr.*, for appellant.
*Bert Hanson*, Assistant Attorney General, for the United States.

[Oral argument Jan. 15, 1921, by Mr. Suthon and Mr. Hanson.]

Before SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:
This case involves the right of the importer to bring into this country from Canada, free of duty, the merchandise hereinafter

---
[1] T. D. 38623 (40 Treas. Dec., 83).

·described, under the provisions of subsection 5 of paragraph J of .section IV of the tariff act of 1913, which we quote:

That all materials of foreign production which may be necessary for the construc- ·tion of naval vessels or other vessels of the United States, vessels built in the United States for foreign account and ownership, or for the purpose of being employed in ·the foreign or domestic trade, and all such materials necessary for the building of ·their machinery, and all articles necessary for their outfit and equipment, may be imported in bond under such regulations as the Secretary of the Treasury may pre- .scribe; and upon proof that such materials have been used for such purposes no duties shall be paid thereon.

By letter dated June 5, 1918 (Exhibit 1), the Croll-Reynolds Co. ·submitted to the importer a proposal to build certain Scotch marine ·boilers according to specifications previously submitted to it. What ·those specifications were the record does not disclose.

The material part of the proposal was as follows:

Our work to include riveting up the combustion chamber complete, assembling and reaming the shell and ends ready for riveting, threading the stay rods, stay bars, .and stay tubes, tapping the nuts for the stay rods and the tube holes for stay tubes, ·but *not* tapping the holes for stay bolts. We would *not* handle the plain tubes or the corrugated furnaces and would, therefore, not drill the combustion chamber front plate or the boiler front plate for the connection to the furnaces as this would much better be done when the boiler was finally assembled. We also count on the ·customer supplying all boiler plates, stay tubes, and nuts to us while we, ourselves, would be able to supply locally the rods, stays and rivet material that we would use in our part of the riveting. * * *

As we have probably advised you, these boilers are built by our principals, The Dominion Bridge Company, Montreal, Canada.

By letter and telegram the Johnson Iron Works (Ltd.) accepted ·this proposal of Croll-Reynolds Co. to build the boilers. The first ·three paragraphs of the letter of acceptance seem to afford all the .knowledge that is necessary as to what the contract in fact was, so far as the same is important to the determination of this case. They are:

With reference to our order, No. 166 of even date, attached hereto for the fabrication of six (6) Scotch boilers, beg to state that this order is given with the understanding that it covers work as outlined in your letter dated June 5th, excepting that you are not to tap the holes for the stay tubes, but that you are to drill the holes ready for tapping .and also with the exception of our shipping to you any stay tubes or nuts.

You are to be responsible for the quality of all materials which you supply, such as rods, stays, and rivets that you use in your part of the riveting, and must meet the requirements and inspection required on these boilers, which includes mill certificates where they are required. · You are also to assume all responsibility and costs, if any, ·for tariff on materials entering or leaving Canada which, of course, does not include the material we are to furnish you, but the material which you are to furnish, attending to .any affidavits, etc., that might be necessary. The material which we will furnish to you will be in accordance with our blue-print order No. 66, dated June 8th, which has been placed with the Emergency Fleet Corporation and which includes items from 1 to 7, inclusive, on page one, and items from 8 to 12, inclusive, on page two.

We wish to explain that the blue print we originally sent you is slightly different ·from the blue prints we enclose with our order, and we, therefore, wish to explain that

we are not responsible for the design of this boiler, as this design was furnished us by the Emergency Fleet Corporation.

Again it is to be observed that we have no further knowledge than that afforded by these quotations from the correspondence as to the precise specifications for the work.

The Croll-Reynolds Co. (Inc.) and the importer are both domestic concerns.

In due course the importer took the matter up with the Dominion Bridge Co., of Montreal, Canada, which produced and forwarded to the importer the merchandise which is the subject of this litigation.

There were two importations, and the question is whether the merchandise of each constituted a complete boiler, or whether it was parts of boilers. If the two alleged boilers were substantially complete, it is not denied that under the authority of United States v. Outerbridge (7 Ct. Cust. Appls., 223; T. D. 36511), they are dutiable. On the other hand, if they were only parts thereof, which, when assembled, would not result in a substantially completed boiler, they would, under the same authority, be entitled to free admission.

See also Toledo Ship Building Co. v. United States (8 Ct. Cust. Appls., 342; T. D. 37609); United States v. Reid & Co. (10 Ct. Cust. Appls., 85; T. D. 38357).

It may be noted that practically all the papers in the case, such as the invoices, bills of lading, protests, entries, collector's receipts, consumption entry permits, applications for free entry, the appraiser's answers to the protests, the affidavits showing the use to which the importations were put, either in terms or in language that by fair implication may be so construed, described the merchandise as "boilers," "complete boilers" or "boilers complete in sections."

At the hearing before the board, however, the principal witness for the importer, William H. Johnson, its president, testified that he personally inspected the importations on their arrival. Bearing upon the question as to whether or not the respective importations were completed boilers, he testified:

A. The Dominion Bridge Company shipped to us two pieces shell plate, four sections head, the heads came in two pieces, your honor, four pieces boiler plate to the boiler, two in each head; there are two internal heads for tube sheets; those internal heads for tube sheets were riveted up into a combustion chamber, what we call a combustion chamber, the combustion chamber consists of these two internal head tube sheets, one crown sheet and one wrapper sheet. Now, that is the only part of the boiler that came to us riveted up.

Q. Is that all that was sent to you by the Dominion Bridge Company?—A. No, there was one reinforced plate, one more whole crown bar, and one lot of staples, that is all.

Q. Is that all that was shipped to you by the Dominion Bridge Company?—A. That is all.

Q. Was anything else covered by the entries?—A. No, sir.

Q. Was that a complete boiler?—A. No, sir; it was not.

Q. What was it?—A. It was only part of a boiler.

Q. What part of it?—A. The shell part of it.

Q. What was necessary to complete the boiler?—A. The balance of the parts necessary to complete the boiler would be the furnaces.

Q. What else?—A. The boiler tubes, ordinary boiler tubes, and the stay boiler tubes, a little bit heavier, your honor, they are used as a press to keep the heads together, and the rivets, the grate bars, and more (man) hole plates and arches, all of which we furnished.

Q. Did you furnish all of these articles?—A. Yes, sir.

Q. To get the record straight detail the articles which you furnished.—A. Well, we furnished the furnace, the boiler tubes and stay tubes, the rivets for riveting up the main shell, the grate bars and stay rods; then the main heads, more whole castings and arches, and the beds, what we call beds or reinforcing plates, they go over the boiler, and the shaker bars; and the items we furnished and the items that the Dominion Bridge Company shipped all went to make a complete boiler.

Q. Was what you received from the Dominion Bridge Company complete, a complete boiler, or were they complete boilers in the sense of machinery?—A. No, they were not.

Q. Could they in the condition in which you received them have been used as a boiler at all?—A. No.

He also testified that the furnaces which were put in the boilers were purchased from the American Supply & Pipe Works, the pipe and stay tubes from the Poggenburg Iron Co., the boiler plates from the American Tube Co., and that other parts, castings, were furnished by local foundries.

In addition to this he testified that at the time of the hearing before the board the importer had one set of the merchandise the same, or like that imported, called a complete boiler in the papers in the case, which was near the place where his testimony was given, available for inspection, and that he would be very glad to have it then inspected. This offer was not accepted by the Government.

There is no claim made that the witness did not tell the truth in his quoted testimony, nor was any effort made to show otherwise, and the argument of the Government is chiefly based upon the inference to be derived from the fact that in the papers in the case, as before stated, the importations were referred to, in substance, as complete boilers. The witness, when asked to explain why in the papers the importations were so referred to, said that so far as the contract for their manufacture by the Dominion Bridge Co. required, they were complete, and the broker who made the entries testified that he entered them as complete boilers, because they were so referred to in the invoices; that he framed the protests to conform to the entries; and that Mr. Johnson had nothing to do with preparation of either, although he signed the latter.

The law, however, must have regard for the facts, and when they are established by credible, undisputed testimony, must control.

As was said in Martin *v*. United States (1 Ct. Cust. Appls., 134; T. D. 31185):

A witness is presumably truthful, and if upon the uncontradicted external facts, themselves not unreasonable or incompatible with strict honesty of conduct, the only deduction which is consonant with such presumption is in favor of the person arriving, it becomes the duty of the courts to sustain his statement rather than to discredit it.

We do not find in this record anything which justifies the conclusion that Mr. Johnson has not told the truth, and we are of opinion that these additional parts were of such a character that his statement that the several importations did not constitute a complete boiler is amply justified. A thing could hardly be a Scotch marine boiler that had no furnace, no boiler tubes, and no grate bars, to say nothing of the other articles which he testified were not imported.

The Board of General Appraisers was of opinion, upon the evidence, that importer had failed to establish that these boilers were not complete when imported, and evidently attached great weight to the language of the various papers above mentioned, that the boiler or boilers were complete.

Were there an issue as to what in fact was actually imported, we would give great weight to this finding on the part of the board, but there being none, we see no reason why this case must not be decided upon the facts, and that is, that each importation did not, and it has been affirmatively shown that it did not, constitute a boiler, wholly or substantially finished.

We might add that the contract, as shown by the quoted correspondence between the parties, clearly indicates that such was not its contemplation.

In its opinion the board stated there was no question but what the pertinent regulations had all been complied with, and the commodities used in such a way as the law required to be entitled to free entry. The Government now suggests that the record does not establish the latter fact. The case below proceeded upon the theory that the only question was whether or not the importations were or were not completed boilers. The record establishes that the boilers were for the Emergency Fleet Corporation, that that corporation placed an order for some of the plates that were supplied after importation; that one of the boilers had been installed on one of the six tug boats built for that corporation by the importer, and that the other would be placed on another one of such boats. These facts seem to constitute a sufficient answer to the Government's suggestion.

We are of opinion that the Board of General Appraisers erred in holding that it had not been shown that these importations did not constitute complete boilers, and therefore that its judgment must be and it is, *reversed*.