CARLIN *v.* UNITED STATES (No. 1879).[1]

EVIDENCE—PRESUMPTION IN FAVOR OF COLLECTOR.

Appellant entered the merchandise in controversy upon an invoice which specified different parts shown to be a complete marine engine in a knockdown condition. It was for use in the construction of four American-built vessels, which required nine such engines. It was short shipped as to the bedplate and crank shaft, which came in another shipment more than a month later. It was installed in one of the vessels, but there is nothing to show whether or not it was fitted with a bedplate and crank shaft imported at the same time and which, though designed for some other vessel, was so standardized as to make it equally available for use on the first one. The collector found that the complete engine was imported in a "knockdown condition" and installed in one of the vessels. With no evidence to impeach his findings, the decision of the Board of United States General Appraisers sustaining the collector's classification of the merchandise as miscellaneous metal manufactures under paragraph 167, tariff act of 1913, rather than as outfit and equipment or machinery building materials under section 4, paragraph J, subsection 5, is sustained.

United States Court of Customs Appeals, May 7, 1918.

APPEAL from Board of United States General Appraisers, Abstract 41390.

[Affirmed.]

*Sharretts, Coe & Hillis* for appellant.
*Bert Hanson,* Assistant Attorney General, for the United States.

[Oral argument Apr. 17, 1918, by Mr. Sharretts and Mr. Hanson.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

Certain goods invoiced as the bedplate, crank shaft, cylinders, crank housings, pistons, connecting rods, bearing valves, outer rings, coupling, flywheel, compressor piston, pumps, compressor, piping, and eccentric strap of one marine engine were entered for consumption at the customhouse, Baltimore, Md., on the 26th of July, 1916, the day on which they were imported.

The collector, in the latter part of November, 1916, finally classified the goods as finished machine parts ready to be assembled into a complete crude-oil-burning engine, and the importation was accordingly assessed for duty at 20 per cent ad valorem under the provisions of paragraph 167 of the tariff act of 1913, which, in so far as pertinent, reads as follows:

167. Articles or wares not specially provided for in this section * * * composed wholly or in chief value of iron, steel, * * * or other metal * * * and whether partly or wholly manufactured, 20 per centum ad valorem.

On December 1, 1916, the importer protested to the collector that the merchandise was not dutiable, and among other grounds of protest the claim was set up that the merchandise was entitled to free

---

[1] T. D. 37643 (34 Treas. Dec., 439).

entry under the provisions of section 4, paragraph *J*, subsection 5, which is as follows:

5. That all materials of foreign production which may be necessary for the construction of naval vessels or other vessels of the United States, vessels built in the United States for foreign account and ownership, or for the purpose of being employed in the foreign or domestic trade, and all such materials necessary for the building of their machinery, and all articles necessary for their outfit and equipment, may be imported in bond, under such regulations as the Secretary of the Treasury may prescribe; and upon proof that such materials have been used for such purposes no duties shall be paid thereon.

The Board of General Appraisers overruled the protest and the importer appealed.

It appears from the record that the consignment was short shipped and that the bedplate and crank shaft entered for duty on the 26th of July, 1916, did not arrive in this country until the 8th of September, 1916. The testimony in the case is to the effect that at the time of importation of the goods in controversy the Baltimore Dry Dock Co., was engaged in constructing four vessels, the *Brammell Point*, hull No. 74; the *Pennant*, hull No. 75; the *Charles*, hull No. 77; and an unnamed vessel, the hull number of which does not appear. For these vessels nine crude-oil combustion engines of 550 horsepower each were imported by the company, three of which engines were installed on the *Brammell Point*, two on the *Pennant*, two on the *Charles*, and two on the unnamed boat.

John E. Kirkhen, foreman of the shipbuilding company, testified in effect that all the articles hereinbefore enumerated were ready for use, and when assembled constituted a complete engine. The testimony of this witness as to the short-shipped bedplate and crank shaft was as follows:

Q. I call your attention to the invoice itself, on which appears the indorsement of short-shipped goods, 1 bed plate, case No. 1, and case No. 3, 1 crank-shaft. Was the engine short of those items?—A. Yes, sir; No. 74 was.

Q. Were they afterwards procured?—A. They were after afterwards procured; yes, sir. *There were lots of stuff short, but we took them from one engine and put it on another, of course, to complete them, and on the last boats we had quite a time getting them, so we started to make some of the stuff.* (Italics ours.)

Q. There appears to be an invoice here, No. 932, for the parts short shipped covered by consular invoices of which the dates are given. Is that the invoice on which they came?—A. Yes, sir.

Q. What you have said about assembling the parts and when assembled constituting a complete engine applies to all nine of the engines?—A. All nine of the engines.

\*  \*  \*  \*  \*  \*  \*

Q. The whole nine engines came to you in a knockdown condition?—A. In a knockdown condition; yes, sir.

E. Thomee, engineer in chief of the Bolinder's Co., which constructed the engines, testified in part as follows:

Q. These engines were imported in a knockdown condition?—A. Yes, sir.

Q. What kind of engines were they when put together?—A. They were crude oil engines.

Q. Combustion engines?—A. Internal combustion engines.

Q. What vessel were they installed in?—A. They were installed on four vessels.

\*        \*        \*        \*        \*        \*        \*

Q. How many engines were put into the *Brammell Point?*—A. Three engines:

Speaking of the engines this witness further testified:

Q. You did not see them when they arrived?—A. No.

\*        \*        \*  .        \*        \*        \*        \*

Q. What do you know about these parts that you have mentioned as being missing having been into the vessel as part of the engine—were they supplied?—A. Yes; they were supplied because the engines were complete when they were installed.

Q. Do you know where they got them?—A. No; I can not tell you because I was not in this country at that time.

Q. You were there when they were installed?—A. Yes, when the engines were installed, when the installation was completed or nearly completed. When I arrived at the place where they were installed all the parts were there.

Q You do not know where they got them, whether they got them from one source or from another?—A. No.

There was no evidence showing that the engine arriving in the country on July 26, 1916, minus a bedplate and crank shaft, was actually installed on the *Brammell Point*, and neither is there any evidence that the missing bedplate and crank'shaft were after their importation actually put in place on board that vessel. All nine engines are of the same horsepower, and apparently of the very same kind, type, and make. Admittedly the engines intended for the *Brammell Point* and the *Pennant* were identically the same. From the testimony it is fair to infer that the construction company lost as little time as possible waiting for " short stuff," and the evidence is direct that engine parts were fitted together regardless of the cases in which they came or the engines for which they were numbered. For all that we know, therefore, the engine lacking the bedplate and crank shaft may have been replaced by an engine originally intended for the *Pennant* or for the *Charles*, or even for the vessel which, when the case was heard by the board, seemingly had not advanced far enough to receive either a name or hull number. And if the engine imported on July 26, 1916, and originally intended for the *Brammell Point* was actually installed on that vessel, there is nothing in the record which would warrant the conclusion that it was not fitted with the bedplate and crank shaft imported at the same time and which, though designed for some other vessel, was so standardized as to make it equally available for use on the *Brammell Point*.

The collector classified the engine actually installed on the *Brammell Point* as a complete engine imported in a "knockdown condition," and in the face of that finding with no evidence to the contrary, we would not be justified in finding that the engine so installed was at the time of importation incomplete and therefore not dutiable as an engine, but as material for building one.

In reaching this conclusion we have proceeded on the assumption that the bedplate and the particular crank shaft referred to must be regarded as essential parts of crude oil burning marine engines, but in so doing we do not wish to be understood as ruling that such matters are within the judicial knowledge. That certain things are necessary parts of certain engines may well be a matter of common and therefore of judicial knowledge, but whether judicial notice may be taken of all the constituents either of steam engines or of crude oil explosion engines is quite another matter.

In our opinion the collector's return has not been impeached, and the decision of the Board of General Appraisers must, therefore, be *affirmed.*