United States *v.* Hannevig (No. 2003).[1]

1. Construction, Paragraph N, Section III, Tariff Act of 1913—"Owner, Importer, Consignee, or Agent"—Protest, Who May File.

When it is shown that the importations were purchased by the protestant abroad, that he owned them at the time they were brought to the United States, and that he paid the duty on them, it appears that protest was filed by a proper party under paragraph N, Section III, tariff act of 1913, providing that it may be filed by the "owner, importer, consignee or agent of such merchandise," notwithstanding that his name does not appear in any of the papers connected with the entry.

2. Evidence, Sufficiency—Presumption.

From the fact that the entries embraced a large number of standardized parts of engines for use in the building of certain vessels, and from the reports to the collector of a special agent that nine of such engines had been installed upon such vessels, it can not be inferred that the engines had been assembled abroad and shipped here in a "knockdown" condition.

3. Classification Determined by Condition at Importation.

It is well settled that, in the absence of deception, disguise, or artifice resorted to for the purpose of perpetrating a fraud upon the revenue, imported merchandise must be classified with reference to its condition when imported. Indeed this rule applies in cases where merchandise has been manufactured or prepared for the express purpose of being imported at a lower rate of duty. If the collector may review the entries of one importer for many months covering standardized engine parts in order to determine for classification purposes how many complete engines were imported, it is difficult to see how this rule is not violated.

---

[1] T. D. 38384 (38 Treas. Dec., 354).

4. CONSTRUCTION, SUBSECTION 5, PARAGRAPH J, SECTION IV, TARIFF ACT OF 1913—
   "MATERIALS," MANUFACTURES DISTINGUISHED—STANDARDIZED PARTS.

   The finished product of one manufacture may become the material for the next in rank.—Tide Water Oil Co. *v.* United States (171 U. S., 210). The provision of subsection 5, paragraph J, Section IV, tariff act of 1913, admitting free of duty "materials" necessary for the building of the machinery of American vessels does not mean that such materials must be crude, but includes standardized parts of engines.

5. IMPORTATION OF ALL PARTS IS IMPORTATION OF WHOLE.

   The importation in one shipment of enough standardized parts to make a complete engine is an importation of an engine.—United States *v.* Outerbridge & Co. (7 Ct. Cust. Appls., 223; T. D. 36511). This is not altered by the fact that the importation contained also other standardized parts of engines.

6. STARE DECISIS—RES ADJUDICATA.

   The case of Carlin *v.* United States (8 Ct. Cust. Appls., 392; T. D. 37643), involving an engine imported in a "knockdown" condition, is neither stare decisis nor res adjudicata of this issue, involving standardized engine parts, but without evidence of "knockdown" condition.

7. SUBSECTION 5, PARAGRAPH J, SECTION IV, TARIFF ACT OF 1913, AND ARTICLES 406, 407 AND 408, TREASURY REGULATIONS, 1915, PURSUANT THERETO.

   Subsection 5, paragraph J, Section IV, tariff act of 1913, provides that certain articles for American vessels *may* be imported in bond under such regulations as the Secretary of the Treasury may prescribe. These regulations are articles 406, 407 and 408, Treasury Regulations, 1915. Where the importer was compelled to pay the duties assessed before the goods were delivered to him no bond was necessary; and where the duty had been paid and there is no dispute that the merchandise was spare engine parts for an engine which was placed upon an American vessel, compliance with the regulations was unnecessary.

8. SUBSECTION 5, PARAGRAPH J, SECTION IV, TARIFF ACT OF 1913—"OUTFIT AND EQUIPMENT" FOR AMERICAN VESSELS—SPARE ENGINE PARTS.

   Spare engine parts for an engine installed upon an American vessel, no claim being made that the number was greater than was necessary or that they were not placed on board for the purpose of replacing the corresponding parts of the engine as they might be broken or wear out, are "outfit and equipment" for American vessels under subsection 5, paragraph J, Section IV, tariff act of 1913.—United States *v.* Richards (8 Ct. Cust. Appls., 231; T. D. 37496).

9. STANDARDIZED ENGINE PARTS—COMPLETE ENGINES—SPARE ENGINE PARTS.

   The protests involve a number of importations at different times of standardized marine engine parts for American-built vessels. They were entitled to admission free of duty under subsection 5, paragraph J, Section IV, tariff act of 1913, as materials necessary for the building of the machinery of American vessels, except that, where one importation included enough of such parts to build one complete engine, that portion should have been classified as an engine, and was properly assessed with duty by the collector as manufactures of metal under paragraph 167. One importation of spare or duplicate parts for an engine already installed on an American vessel was entitled to free entry as "outfit and equipment" for American vessels.

## United States Court of Customs Appeals, April 13, 1920.

APPEAL from Board of United States General Appraisers, G. A. 8286 (T. D. 38128), [Modified.]

*Bert Hanson,* Assistant Attorney General (*John J. Mulvaney,* special attorney of counsel), for the United States.

*Sharretts, Coe & Hillis* for appellee.

[Oral argument Feb. 26, 1920, by Mr. Mulvaney and Mr. Sharretts.]

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

There are five protests in this case, each covering an importation and entry made at a different time than any of the others but all made during August, September, and October, 1916, and March of 1917 by a customs broker. The goods came from Sweden, are the product of a manufacturing concern there known as the Bolinder Co., and were brought here by four different vessels. Some of the importations came directly to Baltimore, some came through the port of New York, from which they were shipped in bond to Baltimore, where all were entered. As to each importation proper application was seasonably made for entry free of duty under subsection 5 of paragraph J of Section IV of the act of 1913 and the Treasury Regulations promulgated under the authority thereof. Each was separately classified and assessed as manufactures of metal under paragraph 167. They are claimed to be entitled to free entry under the mentioned subsection.

At the hearing of the protests before the board, the Government seasonably moved to dismiss them upon the ground that they were filed in the name of a person who did not appear anywhere in the record to be the owner, consignee, importer, or agent of the merchandise. The board without objection received evidence as to the relation sustained to the importations by the protestant here, Christoffer Hannevig, and in its decision denying the motion said:

We think from the evidence on the point that the protestant has sufficient interest to entitle him to file a protest under the requirements of the statute governing the filing of a protest.

This evidence was in substance as follows: The personal secretary of Hannevig was called by the importer and testified that he handled all of Hannevig's personal affairs, that he was familiar with the transaction evidenced by one of the protests, the invoice accompanying which was shown him. He said that the protestant purchased the property covered thereby in Sweden and that he owned it when it arrived here. It was conceded by the Government that the witness would testify as to the other protests the same as he did to the particular one called to his attention, and we so assume. The witness also testified that Hannevig paid the duty on the importations and that he was in London at the time of the hearing before the board.

Without discussion, it seems to us that this evidence, which was not disputed, sustains the decision of the board on the Government's motion to dismiss.

Each of these several importations consists of interchangeable standardized parts of oil-burning marine engines used for propelling ships. No one importation included all the parts of one engine

except the one covered by protest 930545, which contained all such parts and also other parts that were used in putting up two other engines. Protest 930544 relates to an entry which covered spare parts only. These two protests will be later referred to, but the discussion immediately following relates only to the three remaining protests.

There were built in 1916 and 1917 at the yard of the Baltimore Dry Dock & Shipbuilding Co., at Baltimore, four vessels, viz, the Pennant, the Brammell Point, the Charles Brady, and another ship unnamed. The importations were put together and, in connection with other standardized interchangeable parts the subject of some eight or more other importations and entries, became complete engines on the hulls of the above-named vessels. We understand some of these other entries became the subject of protest and some did not.

The collector upon the inspection of all the entries, both those before us and those that are not, in connection with the reports of a special agent that nine complete engines had been installed on the mentioned vessels, regarded all the importations as constituting nine complete engines and assessed them as already appears.

The Government asks us to infer that these engines had been assembled abroad and then shipped in what is known as a "knockdown" condition. There is no evidence to that effect. The witnesses who were asked about it said they did not know and nothing of record warrants such inference.

It may also be said at the outset that there is nothing in the case that indicates and it is not claimed that there was any fraud or deception practiced or attempted in these importations.

Upon this state of facts the Government contends that—

1. The merchandise as imported constituted parts of entireties, viz, engines, and was dutiable as such.

2. The importations were not of materials necessary for the building of the machinery of vessels, but were articles of metal partly or wholly manufactured.

The importer contends that each importation shall be treated separately and regarded as materials necessary for the building of the machinery of vessels within said subsection 5 of paragraph J, the material part of which we insert here:

That all materials of foreign production which may be necessary for the construction of naval vessels * * * and all such materials necessary for the building of their machinery, and all articles necessary for their outfit and equipment may be imported in bond under such regulations as the Secretary of the Treasury may prescribe; and upon proof that such materials have been used for such purposes no duties shall be paid thereon.

Upon the proposition that the importations were entireties, the Government largely relies upon the decision of the Supreme Court in

Isaacs v. Jonas (148 U. S., 648). In that case the merchandise was 25 cases of cigarette papers and 23 cases of pasteboard covers for the cigarette papers imported by the same person, the paper at the port of New Orleans and the covers at the port of New York and then in bond to the port of New Orleans, where they were simultaneously entered for withdrawal for consumption. The further facts as stated by the court in its opinion were:

The importation of cigarette paper consisted of packages of separate pieces of a paper made of a peculiar material and by a special process, suitable to be used as wrappers for cigarettes, cut into the proper size, and separated into divisions of about 250 pieces by the interposition of pieces of paper of the same size and of different color. The other importation consisted of pasteboard covers of corresponding size, to be used with the paper in making cigarette books, by brushing one edge of each subdivision of the paper with paste or other adhesive substance, and then cementing the paper into the covers, from which the leaves are torn by the smoker as desired, and then the cover (which is useful only to protect the papers) is thrown away. The plaintiff by arrangement with the foreign manufacturers of this paper, was the sole importer thereof into the United States; his intention and motive in importing it were to make it up into cigarette books; and that was the only form in which such paper had been sold at retail. A large part of this importation was so made up into books by the plaintiff, at an expense of about $400 for the hire of workmen; but a part of it, as imported, was sold directly to manufacturers of cigarettes.

The question was whether upon those facts the cigarette paper and the pasteboard covers were "manufactures of paper" or "smokers' articles."

The court summed up its conclusions in the following language:

To decide that these cigarette papers and their covers, or either of the two, are not "smokers' articles" would contravene the plain language, as well as the manifest intent and purpose of the tariff act.

The plain import of this decision is that, for classification purposes, whether the separate importations be regarded as constituting an entirety or be considered separately, these papers and covers were "smokers' articles." It was not held that they were cigarette books.

On the other hand, the law is well settled that in the absence of deception, disguise, or artifice resorted to for the purpose of perpetrating a fraud upon the revenue, imported merchandise must be classified with reference to its condition when imported.

Nothing further than a citation of authorities is needed upon this point. United States v. Schoverling (146 U. S., 76), Worthington v. Robbins (139 U. S., 337), Dwight v. Merritt (140 U. S., 213), United States v. Citroen (223 U. S., 40.).

Indeed this rule applies in cases where merchandise has been manufactured or prepared for the express purpose of being imported at a lower rate of duty. Merritt v. Welsh (104 U. S., 694), Seeberger v. Farwell (139 U. S., 608), United States v. Shoverling, supra.

In Merritt *v.* Welsh it was charged that the sugar of the importations had been purposely manufactured in dark colors to evade duties.    Of this the court said:

Suppose this is true; has not a manufacturer a right to make his goods as he pleases? If they are less marketable, it is his loss; if they are not less marketable, who has a right to complain?   If the duties are affected, there is a plain remedy.   Congress can always adopt such laws and regulations as it may deem expedient for protecting the interests of the Government.

We perceive no reason why this persuasive reasoning is not applicable to an importer who attempts no fraud or concealment.    We are of opinion that the importations here can not be regarded as an entire engine or entire engines for the purpose of classification. No deceit, deception, or fraud has been practiced, no importation covered anything more than parts of engines and the collector should not have regarded such parts as engines.

A more serious question is whether these standardized parts shall be regarded as materials necessary for the building of machinery of naval vessels.   Of course an engine is machinery, and these were placed on naval vessels and designed to propel them.   The language of the paragraph is not free from ambiguity in that it is not clear what the term "materials of foreign production" was intended by Congress to cover.   Whether it means raw materials, material partially manufactured, or such materials as the finished interchangeable parts of engines as in this case, is uncertain, and we are without aid or information on this question except as it may be gleaned from the section itself, construed in view of the purpose to be accomplished by its enactment.

The Government cites many cases where the question of what should be regarded as material has been more or less considered, but we do not consider them especially helpful here because examination thereof at once discloses that the conclusions therein reached depended upon the circumstances of each case and the language of the statute involved, none of which seems sufficiently analogous to the facts and the statute here under consideration to be of assistance.

It is obvious that the term "material" is one of wide latitude.    In giving free entry to materials of foreign production necessary for the building of machinery, we do not believe Congress intended the materials must be crude.   Machinery for ships, of common knowledge, is largely composed of metal, such as iron and steel, and paragraphs 518 and 613 already give free entry to some crude forms of these metals.   Other crude metals that sometimes are used in making machinery parts are also given free entry, so the purpose of subsection 5 must have been to allow free entry to materials of foreign production that had passed beyond the crude state.

162987—21—VOL 10——9

In Tide Water Oil Co. *v.* United States (171 U. S., 210), the Supreme Court had occasion to discuss the meaning of the word "manufactured," and in the discussion, speaking of the word "materials," it was said that the finished product of one manufacture might become the material of the next in rank. After all, this is but a matter of common knowledge, for who does not know that in many industries articles which have been variously processed and finally completed so far as a given operation is concerned, become material for further processing or material out of which, without processing being applied to the article itself, something is built or constructed?

Standardized parts of machinery may never be used to construct a new machine, but only to replace those already in use, and we know that one result of the great advance in manufacturing in modern days is the making of standardized parts of a variety of machines and machinery, which parts as such are the subject of commerce. It could hardly be thought that a standardized part of a watch made in the year 1915 was anything other than material if it transpired that it was not used until 1919 and then substituted for a part that had broken or become worn out. In such a case is it not plain that such parts in the broad sense are materials and nothing else? The fact, if it be so, and it may be assumed, that the protestant here contracted for complete engines, and that, when all his importations are considered, he received them, does not affect the conclusion that, as made, no importation was an engine, either in an assembled or "knockdown" condition. If the collector may review the entries of one importer covering a period of several months and then regard the merchandise covered thereby as one transaction for classification purposes, it is difficult to see why the rule that articles must be classified with regard to their condition when imported is not violated.

In United States *v.* Outerbridge & Co. (7 Ct. Cust. Appls., 223; T. D. 36511), it was pointed out that the obvious intent of Congress in the enactment of subsection 5 of paragraph J was to favor the shipbuilding industry of this country, and it is doubtful if the privilege of importing free of duty material for building the machinery of ships would be of much benefit to that industry unless finished parts of the ship machinery may in proper cases be regarded as material therefor.

In the Outerbridge case it was held that the purpose of the act would not be promoted if parts of ships could be imported free thereunder when nothing remained but to assemble them in this country. It was held that an importation comprising all the parts of a steam engine was an importation of an engine and that such an engine could not be regarded as material necessary for the construction of a vessel.

We are of opinion that the purpose of Congress in the enactment of paragraph J, subsection 5, is more likely to be attained if it be held

that these standardized parts of engines are materials necessary for the building of the machinery of ships than if the contrary view be taken.

If the word "materials" be held to mean something that is not in a crude state, it is exceedingly difficult to know to what point parts of machinery could be processed and still be regarded as *material* therefor and what further manipulation would deprive them of that status. We are unable to see how any such distinction could satisfactorily or fairly be established. Counsel suggest none. The word "building," too, is of wide application, and we think it is fairly within the statute to say that machinery may be built by putting together the interchangeable standardized parts necessary to constitute it.

It will be noted in this connection that a distinction may exist between machines and machinery built upon special order of special and not interchangeable parts and designed for a particular use.

It appears that some of the entries not embraced in the protests here were covered by protests in the case of Carlin *v.* United States (8 Ct. Cust. Appls., 392; T. D. 37643), and the Government urges that our judgment in that case overruling the protests is stare decisis if not res adjudicata of the issue here.

The fact in that case, however, was and the opinion shows that the engine there involved was imported in a knock-down condition. Therein it was said by Smith, Judge, for the court:

The collector classified the engine * * * as a complete engine imported in a "knockdown condition," and in the face of that finding, with no evidence to the contrary, we would not be justified in finding that the engine so installed was at the time of importation incomplete, and therefore not dutiable as an engine.

Each case must be decided upon the record presented, and that case was disposed of upon the theory that the importation in fact comprised all the parts of an entirety, one complete crude-oil-burning engine. As to the three protests now under consideration, the facts, as already pointed out, are different.

It appears, as already mentioned, that the merchandise contained in the importation covered by protest 930645, entry number 828, included all the parts of one engine, and following the rule of the Outerbridge and Carlin cases, we think such parts should be regarded as an entirety and the other parts included in the entry as material. The importer has seen fit to import and enter at one time what in fact is an entire engine. It was his privilege so to do, and the law regards these parts as constituting an entirety. The inclusion of other parts would not change the fact that an entire engine was in the importation.

The Government contends that protest 930644, entry number 817, should be overruled for failure to comply with regulations promulgated by the Secretary of the Treasury.

The subsection provides that the materials and articles covered. thereby *may* be imported in bond under such regulations as the Secretary of the Treasury may prescribe, and that upon proof that they have been used for the duty-free purposes no duties shall be paid thereon. If no bond is given, what the proof as to the use may be neither the statute nor the regulations provide.

Article 406 of the Treasury Regulations of 1915 is consistent with the statute as to procedure upon entry.

Article 407 provides that when bond is given under subsection 5 certain affidavits shall be furnished by the importer to show that the merchandise has been appropriated to the duty-free uses and that the collector if satisfied in that respect shall cancel the bond.

Article 408 provides that a customs officer or special agent shall inspect the vessel at proper times upon the request of the collector of customs and shall report to him the result of his inspection. This was amended in T. D. 37000 to require the importer to give the collector sufficient notice of the departure of a vessel to enable any inspection to be made that might be deemed necessary.

It is contended by the Government that as to the merchandise covered by the protest under immediate consideration while application for free entry was seasonably made, the above-mentioned affidavits were not furnished by the importer, also that the inspection to ascertain whether the materials had been used in the manner intended by the statute had not been made.

But the record here seems to show and we understand the fact to be that the merchandise covered by this protest was assessed by the collector and the importer compelled to pay the duties before the goods were delivered to him. It is not clear whether a bond was given, but it is clear to us that no bond was necessary under the circumstances.

With reference to this protest the collector in his report to the board stated that the entry covered "spare parts of engine No. 1052 which was already complete," and there is no dispute that this engine was placed on one of the hulls. The finding of the collector that these were spare parts for an engine, coupled with the fact that the engine was put on one of the hulls, would seem to satisfy the statute and deprive this claim of merit.

The Government, however, further contends in this connection that the merchandise covered by this protest could not be regarded as articles necessary for the outfit and equipment of vessels as claimed by the importer.

In United States *v.* Richards (8 Ct. Cust. Appls., 231; T. D. 37496), it was held that extra or duplicate spare parts of installed machinery on a vessel were proper outfit and equipment of the vessel, and we think the parts covered by this protest fall within that rule. No

claim is made that the number was greater than was necessary, or that they were not placed on board for the purpose of replacing the corresponding parts of the engine as they might become broken or worn out.

The result is that the judgment of the Board of General Appraisers is reversed as to protest 930545, so far as it covers all the parts of one engine, and the classification and assessment of the collector relating to such engine is sustained. In all other respects the judgment of the Board of General Appraisers is *affirmed.*