The United States Aluminum Co. and Aluminum Co. of America
*v.* United States (No. 3015[1])

---

[1] T. D. 42764.

United States Court of Customs Appeals, May 7, 1928

*Sharretts, Coe & Hillis (Edward P. Sharretts* of counsel) for appellants.
*Charles D. Lawrence,* Assistant Attorney General (*Reuben Wilson* and *Fred J. Carter,* special attorneys, of counsel), for the United States.

[Oral argument February 14, 1928, by Mr. Sharretts and Mr. Carter]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

BARBER, Judge, delivered the opinion of the court:

It is agreed that the merchandise involved in the two protests covered by this appeal, one on behalf of each of the respective appellants, includes two hydraulic machines, one known as an extrusion press and the other a piercing press, each of which is composed of a large number of parts. One machine when set up is said to cover from 10,000 to 15,000 and the other some 5,000 square feet. They are used to manufacture various aluminum articles. Each machine was built in France, according to specifications furnished by one or both of the appellants, who are domestic corporations, or at least corporations doing business in the United States. The two machines were imported, boxed in 38 separate cases, covered by entries 1809 and 1810. Nine of the cases, it is agreed, were "short-shipped." Twenty-nine cases arrived in New York January 2, 1925, and the remaining nine arrived on a different vessel January 5, following. Both shipments were immediately delivered to the respective importers without examination, shipped in bond to Pittsburgh, and the cases were opened, the machines assembled and installed in the plant of importers at New Kensington. These two shipments were both covered by the same consular invoice. The entries were made at the same time. The expression "short-shipped" evidently means, in this case, that while it was designed to ship 38 cases at one time it was not done, and that the 9 cases were forwarded shortly after the 29 by another vessel. The two shipments were regarded by the customs officials and the importers as in effect but one, and as covering two complete machines.

After being assembled and set up in the importers' factory the machines were examined by a customs examiner and found not to be in any way marked so as to show the country of origin. The examiner advisorily appraised and classified them as machines not specially provided for under paragraph 372 of the Tariff Act of 1922, reported to the collector that they were not marked as required by section 304 (a) of the act, and directed importers to mark them by placing on a conspicuous part of each machine a plate containing

the inscription "Made in France" or "France." The photographic exhibits of the machines show that the words "Made in France" were so placed on each. It is agreed that these 38 cases contained all the substantial parts of the two machines, and that the machines were imported in what is called a "knocked-down" condition.

The remaining merchandise involved in these appeals is represented by two entries, 2402 and 2662, one imported in March and the other in April, 1925, and consists of various tools to be used in connection with the machines. These later importations were entered as machine tools and parts, and are referred to in the exhibits in the case as special tools, dies, and die blocks. None of these articles was marked to show the country of origin. The same examiner reported them to the collector as not marked as required by law, and instructed the importers to mark each thereof. This instruction was complied with by electrically etching on each article the words "Made in France." It appears from the testimony that subsequent smaller importations of similar tools by the same shipper have been made and that before importation they were likewise marked.

At the liquidation of the entries the collector assessed duty on the two machines and upon the machine tools at 30 per centum ad valorem under paragraph 372 of the present Tariff Act. The liquidation in this respect is not challenged. He also assessed a duty of 10 per centum ad valorem under section 304 (a), and the legality of this assessment is the only question here involved. The Customs Court sustained it.

Section 304 (a) provides—

That every article imported into the United States, which is capable of being marked, stamped, branded, or labeled, without injury, at the time of its manufacture or production, shall be marked, stamped, branded, or labeled, in legible English words, in a conspicuous place that shall not be covered or obscured by any subsequent attachments or arrangements, so as to indicate the country of origin. Said marking, stamping, branding, or labeling shall be as nearly indelible and permanent as the nature of the article will permit—

and also that a duty of 10 per cent of the appraised value, in addition to the regular duty imposed by law thereon, shall be assessed on imported articles not marked pursuant to the section.

At the hearing before the court below considerable testimony by an expert metallurgist was taken on importers' behalf, tending to show that a great many, if not all, of the respective parts of the separate machines, except certain castings, as well as many or all of the articles covered by entries 2402 and 2662, could not, in view of the peculiar methods of their manufacture, be marked without injury thereto. The reason given for this was that many thereof were, when in use in the machines, subjected to great pressure or strain, to undergo which they were made in a special manner, and that to scratch the surface thereof with the electric needle with which they

were etched would impair their ability to withstand such strain or thereon to demonstrate that each part of the machines, except the castings, and all the articles covered by the later importations, were incapable of being marked without injury as provided in the section. Inasmuch as we regard the two machines as the articles required to be marked, it is unnecessary to consider this claim so far as it relates to the separate parts thereof.

So far as the importations covered by the entries 2402 and 2662 are concerned, we dismiss this contention with the remark that the testimony does not require the conclusion claimed. At the most the witness said that as an expert metallurgist it was his *opinion* that such a treatment "runs grave danger of permanent injury to the article." There is no other proof that such articles were not capable of being marked without injury. There is no proof that they have ever, by reason of the etching thereon, been found incapable of performing their function, and it appears that at the time this testimony was given the machines in question had been in operation some 18 months. Subsequent importations of similar articles by the same importers have been marked in that manner, without complaint so far as the record shows.

It is claimed that to warrant assessment under section 304 (a) it must appear that the machines were capable of being marked as therein provided; and that, assuming it was proper to defer the examination and classification thereof until they had been delivered to importers and set up in the factory, the record shows that thereafter there was no examination or determination by the examiner, appraiser, or collector as to whether or not they were capable of being marked so as to show the country of origin.

We think it is unnecessary to consider in detail the arguments advanced in this connection. The fact that the collector has assessed the 10 per centum duty provided in section 304 (a) imposes upon importers the burden of showing that the merchandise was not capable of being marked within the meaning of the section. It is obvious, and there is no evidence tending to show that the castings, which are a part of each machine, can not be marked or can not carry a plate or plates which may be marked as the section requires.

Another contention is that the machines are not articles within the meaning of section 304 (a), regarding which it is said— .

Probably Congress never intended the word "article" as used in section 304 (a) to refer to an elaborate system of machinery built to order under specifications and erected in an American mill or factory.

We can only infer what Congress intended from the language it used. The word "article" as commonly understood is of wide and comprehensive meaning. Paragraph 372 refers to a great variety of machines, some of which are ponderous, indicating that size is not

necessarily controlling as to what is a machine—an article. The machines here are regarded as entireties for the purpose of classification under that paragraph, and for the purposes of this case we can not say that they are not articles within the meaning of section 304 (a).

It is also urged that there is undisputed testimony to the effect that there could not, because of the size of the machines when assembled, be placed upon either of them before they were imported a plate, the marking upon which would apply to the entire machine and indicate to an observer that the machine as a whole was made in France. There is such testimony, but we do not regard it as controlling. Whether the words "Made in France" of themselves so indicate is a matter of opinion, and the argument of importers that they would apply only to the particular part of the machine upon which they were placed may or may not be tenable. That, however, it was easily possible to mark any of the exposed castings so as to indicate the country of origin of the entire machine can not reasonably be doubted.

The final contention of importers is that if "under the rule stated by this court in *United States* v. *Hannevig*, 10 Ct. Cust. Appls. 124, the merchandise here in question must be regarded as 'material' for the construction of machinery and not as entireties, then the record shows that such material was not capable of being marked without injury and therefore was not subject to the 10 per centum duty prescribed in section 304 (a)."

We have examined the *Hannevig* case and do not think it is applicable to the one at bar, in view of the reasons given for the conclusions therein reached, which it is unnecessary to repeat here. That case involved standardized interchangeable parts of machines, the subject of some five importations and entries, out of which, in connection with other importations, some nine complete engines could be and were made. In view of the applicable statute and the circumstances of that case, we held that four of the importations were not to be regarded as engines, or as parts thereof for the purposes of classification, but were materials for the building of machinery. It will also be noticed that in the case at bar there are, so far as appears, no standardized interchangeable parts of these two machines, but each part is made upon a specific order therefor, and designed to become, when the particular machine is assembled, an integral part thereof.

We are of opinion that the two machines, as well as the merchandise covered by entries 2402 and 2662, were articles required to be marked before importation under section 304 (a), and in the absence thereof were subject to the additional duty prescribed in that section.

The judgment of the Customs Court is therefore *affirmed*.