D. Salemi & Sons *v.* United States (No. 3404)[1]

United States Court of Customs and Patent Appeals, April 27, 1931

*Brown & Carter* (*Allan R. Brown* and *Fred J. Carter* of counsel) for appellant. *Charles D. Lawrence,* Assistant Attorney General (*William H. Futrell,* special attorney, of counsel), for the United States.

[Oral argument April 1, 1931, by Mr. Carter and Mr. Lawrence]

Before Graham, Presiding Judge, and Bland, Hatfield, Garrett, and Lenroot, Associate Judges

Hatfield, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court.

Merchandise, consisting of silk bedspreads and silk fringes, imported together and designed to be attached and used together, was held to be entireties and assessed for duty by the collector at the port of New York at 90 per centum ad valorem as articles composed in part

[1] T. D. 44892.

of "fringes" under paragraph 1430 of the Tariff Act of 1922, the pertinent part of which reads as follows:

PAR. 1430. * * * edgings, trimmings, fringes, gimps, ornaments; braids, loom woven and ornamented in the process of weaving, or made by hand, or on any braid machine, knitting machine, or lace machine; and all fabrics and articles composed in any part, however small, of any of the foregoing fabrics or articles; all the foregoing, finished or unfinished (except materials and articles provided for in paragraphs 920, 1006, 1404, 1406, and 1424 of this Act), by whatever name known, and to whatever use applied, and whether or not named, described, or provided for elsewhere in this Act, when composed wholly or in chief value of yarns, threads, filaments, tinsel wire, lame, bullions, metal threads, beads, bugles, spangles, or products of cellulose provided for in paragraph 1213 of this Act, 90 per centum ad valorem; * * *

It is claimed by counsel for appellants that the imported merchandise is not dutiable as entireties; that the fringes are separately dutiable at 90 per centum ad valorem under paragraph 1430, *supra;* and that the silk bedspreads are separately dutiable at only 60 per centum ad valorem as manufactures of silk under paragraph 1211 of the Tariff Act of 1922, which reads as follows:

PAR. 1211. All manufactures of silk, or of which silk is the component material of chief value, not specially provided for, 60 per centum ad valorem.

It appears from the record that the bedspreads and fringes are designed by the foreign manufacturer to be attached and used together; that the importer was unable to purchase the bedspreads without the fringes; that the fringes accompanying the bedspreads were of the proper length and color to be used on them; that prior to the enactment of the Tariff Act of 1922 like spreads and fringes were attached by the foreign manufacturer and imported in that condition; that after the enactment of the Tariff Act of 1922 they were imported detached, as in the instant case, for the purpose of limiting the application of the 90 per centum ad valorem rate of duty, provided in paragraph 1430, to the imported fringes; that prior to 1925 like bedspreads were sold by the importer with fringe attached; that during and since the year 1925 the importer has sold approximately from 70 to 80 per centum of like imported bedspreads with fringe attached and the balance without fringe; that occasionally the importer attached domestic fringe to such imported bedspreads; and that, although he sometimes sold the imported fringe separately, he had no knowledge as to the uses to which it was put.

Upon this record the court below, in an opinion by Tilson, Judge, held, on the authority of the case of *Altman & Co.* v. *United States,* 13 Ct. Cust. Appls. 315, T. D. 41232, that the imported merchandise was properly assessed by the collector as entireties and, accordingly, overruled the protest.

It is contended by counsel for appellants that, due to the fact that the involved fringes were not labeled with words and figures to

indicate to which bedspreads they were to be attached and as the beadspreads and fringes were imported detached and were attached only in case the purchaser desired to purchase them as entireties, the involved articles were not entireties for customs purposes; that the bedspreads might be finished with edgings, domestic fringes, or other trimmings, instead of the involved fringes, and, when so finished, serve their intended purpose; that the imported fringes could be used for decorating and trimming other articles; and that, when fringe is attached to a bedspread, each retains its identity and performs its separate function.

The involved fringes were made in proper lengths, matched as to color, and designed to be used with the imported spreads. There is no testimony in the record that they could be used in their imported condition for any other purpose. Furthermore, as imported, the bedspreads were in an unfinished condition. They were designed to be finished by attaching the silk fringes thereto, and, when attached, the fringes are essential parts of the bedspreads and are no longer fitted for any other purpose. Neither a bedspread nor a fringe designed to be used thereon is complete without the other, and, when united, they merge to form a new article. We are of opinion, therefore, that the merchandise was properly assessed as entireties. *Altman & Co.* v. *United States, supra; United States* v. *N. S. Meyer (Inc.),* 18 C. C. P. A. (Customs) 201, T. D. 44381.

The judgment is *affirmed.*

### DISSENTING OPINION

GARRETT, Judge: According to the record in this case the importers have been engaged in importing merchandise of the type involved for many years. During the period when the Tariff Act of 1913 was in force the fringes were attached to the spreads before importation, and the articles were imported as entireties, the fringe element having no effect upon the duty rate.

After the passage of the Tariff Act of 1922 appellants and other importers began to import the merchandise as separate or segregated articles—the spreads in one parcel and the fringes in another. I think it fairly inferable that this was done largely in order that the spreads proper might not be controlled in classification by the fringe and assessed under paragraph 1430.

There being no deception, disguise, or artifice resorted to for the purpose of perpetrating a fraud upon the revenue (see *United States* v. *Hannevig,* 10 Ct. Cust. Appls. 124, 128), this was a legitimate practice which the courts have frequently sanctioned. *Merritt* v. *Welsh,* 104 U. S. 694; *United States* v. *Schoverling,* 146 U. S. 76; *United States* v. *Citroen,* 223 U. S. 407; *Tower & Sons et al.* v. *United States,* 11 Ct. Cust. Appls. 157, 162.

It was, apparently, the view of the collectors of customs that, being imported in this segregated condition, the items were separately classifiable, and this was the practice, at least at the port of New York. According to the testimony of Mr. Irwin, an examiner of merchandise in the office of the appraiser there, this practice of separate classification continued until the particular shipment here involved came into port, which seemingly was in March, 1925. This shipment was then classified as an entirety, and by reason of the fringe the entire article was assessed at 90 per centum ad valorem.

Under the record in this case, viewed in the light of the authorities heretofore cited and others contained in decisions of this court, I am unable to agree with the trial court or with the majority of this court in sustaining the collector's classification.

The brief in behalf of appellants correctly states:

The decisions on the question of entireties have reached widely divergent conclusions.

In the *Altman* case, cited by the majority, presiding Judge Graham gave a succinct review of many cases which have been passed upon by this court wherein the question of entireties was involved.

Since the *Altman* case others have been before us, including that of *Wanamaker* v. *United States*, 16 Ct. Cust. Appls. 548, T. D. 43266.

It seems to me that the instant case is more nearly on all fours with the *Wanamaker* case than with the *Altman* and *Meyer* cases, cited by the majority.

The facts in the *Wanamaker* case, as stated in the opinion, were:

The imported merchandise consists of pieces of cotton canvas, stamped with designs in various colors, and silk yarn and wool yarn, in corresponding colors, intended to be embroidered over the designs. Each bundle of yarn—silk or wool, as the case may be—was imported with the particular canvas on which it was designed to be used. When, by the use of the yarn, the design on the canvas has been embroidered, the embroidered article is used for making hand bags, bell pulls, hassocks, and cushion, chair, and bench covers. The canvas and the yarns are sold together.

In the *Altman* case it was found that the corsets involved were imported in "two pieces, fitted with clasps or fasteners and eyelets for laces," shipped in boxes in cases, and that in these cases, but in separate packages, were also pieces of lace, to each piece of which was pinned a label "with words and figures indicating a number and size corresponding to some corset in the case." The lace trimmings were held to be "parts" of the corsets.

It was held in the *Wanamaker* case, notwithstanding the fact that the record showed "that the yarn in question was intended to be used to embroider the pieces of canvas," that "the pieces of cotton canvas and the yarn * * * are not 'parts' capable of being attached or put together by mere assembly."

In the instant case the record shows that while 80 per centum or more of the spreads and fringes were put together *after* importation and sold as entireties, yet, in instances, the spreads were cut into pieces and other articles or sets manufactured from them such as "a spread, a bolster, two scarfs, three vanity pieces, and one piece for a night table," and that some of the fringes were sold separately, the uses to which they were put when so sold being unknown to the witness who was the importer.

In the *Meyer* case we held that, under the proof there presented as to use and trade understanding, the classification by the collector of metal parts of spurs and leather straps designed for use therewith as entireties should be sustained. We said:

The collector's classification carries with it the presumption that the goods were either commonly or commercially known throughout the United States as "saddlery or riding-bridle hardware." There was no attempt to prove that they were not so known in any trade except the Army and Navy trade referred to.

Elsewhere in the opinion it was held that the testimony as to Army and Navy trade had been thoroughly rebutted.

In the instant case I know of no reason why the presumption of correctness should apply with any greater degree of force to the collector's present classification than it does to his classifications under the earlier practice. That he was not right both times is evident.

It is my opinion that, so far as the authorities are concerned, the *Wanamaker* case is much more in point than any other found and that, independent of the authorities, there being none which seems to me adverse, the spreads and fringes should be separately classified. I therefore respectfully *dissent*.