## MERRITT *v.* WELSH.

A., in 1879, imported sugars to which an artificial color was not given after they had been manufactured. *Held,* that, under schedule G, sect. 2504, Rev. Stat., the sole test of their dutiable quality was their actual color, as graded by the Dutch standard, and that they were subject to the duties prescribed by that schedule, with twenty-five per cent added thereto, pursuant to sect. 3 of the act of March 3, 1875, c. 125, 18 Stat. 339.

ERROR to the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

*The Solicitor-General* for the plaintiff in error.

*Mr. William M. Evarts, Mr. Stephen G. Clarke,* and *Mr. Edwin B. Smith, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

This was an action brought by S. & W. Welsh, the plaintiffs below, to recover back duties alleged by them to have been illegally exacted by Merritt, the defendant below, as collector of the port of New York, on certain sugars imported by them. The importations were made in 1879, and were subject to the duties imposed by schedule G, sect. 2504, of the Revised Statutes, and by the third section of the act of March 3, 1875, c. 127, which are in the following words:—

" SECT. 2504: Schedule G:

" Sugar not above number seven, Dutch standard in color : one and three-quarter cents per pound.

"Sugar above number seven, and not above number ten, Dutch standard in color : two cents per pound.

" Sugar above number ten, and not above number thirteen, Dutch standard in color : two and one-quarter cents per pound.

" Sugar above number thirteen, and not above number sixteen, Dutch standard in color : two and three-quarter cents per pound.

"Sugar above number sixteen, and not above number twenty, Dutch standard in color : three and one-quarter cents per pound."

. The following sections of the Revised Statutes were appended as provisos to the original acts from which the above articles were taken :—

"SECT. 2914. The standard by which the color and grades of sugar are to be regulated shall be selected and furnished to the collectors of such ports of entry as may be necessary, by the Secretary of the Treasury, from time to time, and in such manner as he may deem expedient.

"SECT. 2915. The Secretary of the Treasury shall, by regulation, prescribe and require that samples from packages of sugar shall be taken by the proper officers, in such manner as to ascertain the true quality of such sugar; and the weights of sugar imported in casks or boxes shall be marked distinctly by the custom-house weigher, by scoring the figures indelibly on each package."

To the foregoing duties twenty-five per cent was added by the third section of the act of March 3, 1875.

The plaintiffs claimed that the sugars imported were all below number 7, Dutch standard in color, and were, therefore, chargeable, under schedule G, with only a duty of one and three-quarter cents per pound, with the addition of twenty-five per cent, under the act of 1875. The defendant, under general instructions from the Treasury Department, rated them at a higher grade, and charged a duty of two cents upon some of them, and two and one-quarter cents upon others, with the addition of the twenty-five per cent, under the act of 1875. His action was based on the position that the sugars in question had been colored by artificial means, so as to reduce them, in appearance, below the grade of the Dutch standard to which they properly belonged according to the amount of crystallized sugar which they contained, as shown by chemical test by the polariscope.

The treasury instructions under which the test was applied were issued on the 19th of July and the 2d of September, 1879. After premising that it had been decided by the courts that the term "Dutch standard in color," as used in the statutes, means the color of the sugar obtained by the ordinary processes of manufacture as practised at the time of the enactment of the law, and that any means used to degrade the color of sugars during or after the process of manufacture is a fraud upon the revenue, the instruction of July 19, 1879, declares that—

"All sugars containing ninety per cent, and not more than

ninety-four per cent, of crystallizable sugar, the apparent color of which is not above No. 7, Dutch standard in color, shall be classified as above No. 7 and not above No. 10, Dutch standard in color.

"All sugars containing more than ninety-four per cent of crystallizable sugar, the apparent color of which is not above No. 10, Dutch standard in color, shall be classified as above No. 10 and not above No. 13, Dutch standard in color."

As the presence of water in the sugars was found to interfere with uniform results, the instruction was changed in September, as follows : —

"All sugars the apparent color of which, as imported, is not above No. 7, Dutch standard in color, and which contain over ninety-three per cent, and not over ninety-seven per cent, of crystallizable sugar in one hundred parts of the dry substance, shall be classified as No. 7 and not above No. 10, Dutch standard.

"All sugars the apparent color of which, as imported, is not above No. 10, Dutch standard in color, and which contain over ninety-seven per cent of crystallizable sugar in one hundred parts of the dry substance, shall be classified as above No. 10 and not above No. 13, Dutch standard."

It was shown beyond dispute, on the trial, that, so far as their color was concerned, the sugars were below No. 7 of the Dutch standard, — a grade chargeable, by the statute, with only one and three-quarters cents per pound; but the court allowed the defendant to prove, if he could, that the color of the sugars was an artificial color, imparted after the process of manufacture, or after they became the sugars of commerce. As no proof was offered to show that they were artificially colored after the process of manufacture was completed, the court instructed the jury to find a verdict for the plaintiffs for the difference of duty.

The defendant offered to prove that color was imparted to the sugars in the course of manufacture, by the use of an extra quantity of lime (some quantity of which is always used to neutralize acids) or by the introduction of molasses, and increasing the temperature of the vacuum-pan or boiler; but this evidence the court held to be incompetent. To narrow

the point of difference, he offered to show that coloring matter, namely, molasses, was introduced into the vacuum-pan or boiler after the mass had been brought to the state of sugar, but before its final passage through the coolers and the centrifugal tubs, — the last process through which it goes; but this evidence was also decided to be incompetent.

The position and argument of the defendant may be more fully shown by the instructions which his counsel asked the court to give the jury, and which were severally refused. They were as follows: —

"1. That if the jury shall find from the evidence that the true color of the sugar in suit, as ascertained by comparing them in every respect with the standard selected by the Secretary of the Treasury, and actually used in ascertaining and determining their dutiable character, was not sugar 'not above number seven Dutch standard in color,' they shall find a verdict for the defendant.

"2. That if they shall find from the evidence that on December 22, 1870, and prior thereto, the sugars of commerce were comprised substantially of crystallized sugar and molasses, and that the color of the different grades of such sugar was produced by molasses, the highest grades being No. 20, Dutch standard in color, having no molasses in them, and the lower grades being 16, 13, 10, and 7, Dutch standard in color, having molasses in them, each of the lower grades having more molasses than the other, so that the greatest quantity of molasses was contained in the lowest grades;

"And if the jury shall also find from the evidence that the sugars in suit were not generally known as the sugars of commerce in December 22, 1870, and prior thereto, and that their color at the time of importation was not produced by molasses, but was produced by the introduction of some foreign substance after the sugars were made for the purpose of giving to them a color darker than their true color;

"And if the jury shall also find from the evidence that the true color of said sugars is different from their apparent color, and that the true color of said sugars at the time of their importation was above No. 7, Dutch standard in color, they shall find a verdict for the defendant.

"If the jury shall find that the sugars were colored with burnt molasses, and were manufactured prior to the time when the burnt molasses was introduced into the vacuum-pan, and that the same was so introduced into the pan merely for the purpose of producing a dark surface-color upon the sugars, so that the sugars, the true color of which was above No. 7, Dutch standard in color, appeared to the eye by comparison with the Dutch standard in color to be sugars not above No. 7, Dutch standard in color, and shall also find that the true color of the sugar when it became manufactured was above No. 7, Dutch standard in color, they shall find a verdict for the defendant.

"The court ruled there was no evidence to submit to the jury tending to show that the color was not imparted to the sugar during the process of manufacture.

"4. If the jury shall find from the evidence that the Dutch standard consists of sugars in which the color indicates the grade of the sugar, and shall also find that the color of the samples in suit does not indicate at all the grades of the sugar, but that the sugars in suit are in fact of a high grade, say No. 16, as indicated by the Dutch standard, but have a surface-color of the lowest grade, say not above No. 7, Dutch standard in color, which surface color was imparted to it after the crystals of sugar were found in the vacuum-pan at a time when the boiling of the sugar was completed, they shall find a verdict for the defendant.

"5. That the surface or external color of the sugars in suit was not necessarily the color by which their dutiable character was to be ascertained, but the true color of the sugars in suit, as ascertained by comparison with the standard which was in use by the collector, and was actually used for the purpose of ascertaining the dutiable character of the sugars in suit, was the color to guide him in ascertaining and levying duties upon them.

"6. That if the jury shall find from the evidence that the surface or external color of the sugars in suit was produced by the introduction of a foreign substance at a time subsequent to the manufacture of sugar, and shall also find from the evidence that when said foreign substance is removed from the surface

of said sugars, that they have not a color of sugars not above
No. 7, Dutch standard in color, but do have a color of sugars
above No. 7, Dutch standard in color, they shall find a verdict
for defendant.

"The court ruled there was no evidence to submit to the
jury tending to show that the color was not imparted to the
sugar during the process of manufacture.

"7. That for tariff purposes centrifugal sugars are required
to have a color obtained by the process of manufacture, with-
out the introduction of any foreign substance in the process of
manufacture for the purpose only of obtaining a darker color
than that which the sugars would have obtained in the natural
process of manufacture.

"8. That if the jury shall find from the evidence that a for-
eign substance was introduced into the sugars in suit, during
the process of the manufacture, which made them darker in color
than they would have been but for the introduction of such
foreign substance, and shall also find from the evidence that
but for the introduction of said foreign substance the apparent
color of the sugars in suit would not have been that of sugars
not above No. 7, Dutch standard in color, but would have been
of a higher grade, they shall find a verdict for the defendant.

"9. The jury may examine the samples of the sugars in suit,
and themselves compare them with the sugars of the Dutch
standard; and that if the jury find as a matter of fact that the
sugars in suit are not of the color of any of the colors of the
Dutch standard, they may find as a matter of fact whether
the defendant erred in his classification.

"And that if they find the collector did classify the sugars
in suit according to their true color from the best means in his
control, they may find for the defendant.

"10. Sugar is above No. 7, Dutch standard in color, within
the intent of the statute, if it be above that number when
reduced mechanically to the same fineness and packed in the
same manner as such standard.

"11. Sugars composed of crystals larger than those of the
standards furnished by the Secretary of the Treasury may
properly be reduced to the same fineness as those of such stand-
ards, and packed in bottles in the same manner for comparison-

with such standards, in order to determine the color or classi-fication."

It will be perceived that the real question in the case ·is, whether (supposing that sugars are not artificially colored for the purpose of avoiding duties after being manufactured) their dutiable quality is to be decided by their actual .color, graded by the Dutch standard, or by ·their saccharine strength as ascertained by chemical tests. The plaintiffs maintain the former proposition ; the defendant, the latter.

The test described by the statute is, " Dutch standard in color." The first question that naturally arises is, if Congress desires the application of the chemical test, in order to de-termine the saccharine strength of the sugar, why does not Congress say so ? There are two very distinct and different modes of distinguishing sugar, — by its color,·and by the intrin-sic percentage of specific crystalline sugar in· the mass. One is determined by a color standard, the other by a chemical standard. Which of these did Congress adopt ? We think, clearly, the former.

Perhaps Congress may have acted under a mistaken idea that .color would always indicate quality. Perhaps, up to the time that the law was passed, as the processes of manufacture had been conducted, color was an approximate, or general, indica-tion of quality. Suppose this to be so, does it derogate from the fact that color was the standard which Congress, with the lights which it had, saw fit to adopt ? Does it not tend to fortify that fact ? If it be found by experience that the stand-ard is a fallacious one, can the executive department supply the defects of legislation ? Congress alone ·has the authority to levy duties. Its will alone is to be sought.

It appears very clear, from the evidence, that the Dutch standard is a color standard only. As applied to the sugars of the· Island of Java, brought to the mother country, it was un-doubtedly a very fair standard of the quality of sugar. The juice of the cane was reduced in open boilers,· and the viscous or molasses matter was expelled by drainage, assisted by percola-tion of water from a covering of white clay, which improved the sugar both in quality and color. The sugar-merchants of Holland adopted a scale of colors from No. 1 to No. 20, which

is exhibited in small square bottles, containing sugar of the different shades of color, from dark up to nearly white. These bottles were prepared by leading firms of high standing in Holland, and were accepted by the trade as the true standard by which to estimate the grade of sugars. Other nations adopted it as a matter of convenience. It was not an infallible test of quality ; because some sugars had a higher color than their intrinsic charater entitled them to; whilst others had a lower. Nevertheless, no more convenient standard was at hand; and if, by the feel, or the taste, or other physical indications, the merchant had reason to believe that the standard was not a strictly accurate test of quality in a particular case, he exercised his own judgment as to the price he would give, or take, for the article.

In process of time new modes of manufacture were adopted : the vacuum-pan in place of the open boiler, for condensing the liquor; the centrifugal tube in place of the old inverted cone, or leech-tub, for expelling the molasses; and animal charcoal, instead of clayey infiltration, for refining and whitening the result. The perfection of the refining process as now practised renders color in raw sugars a matter of little consequence, provided they contain abundance of saccharine matter. The color standard has come to be a precarious one. Still, if the government chooses to adhere to it, it is bound by it. If Congress, as it has done, adopt the color standard, it is not for the customs department to adopt a different one. When Congress chooses to do this, it will be time enough for the customhouse to follow. As before said, Congress alone has the power to lay taxes and duties.

Great stress is laid on the charge that sugars are manufactured in dark colors on purpose to evade our duties. Suppose this is true ; has not a manufacturer a right to make his goods as he pleases ? If they are less marketable, it is his loss; if they are not less marketable, who has a right to complain ? If the duties are affected, there is a plain remedy. Congress can always adopt such laws and regulations as it may deem expedient for protecting the interests of the government. If, in the case under consideration, a color standard is insufficient, a different one is ready to hand, — that of the polariscope, or other

chemical test.  If the quantity of saccharine matter in sugar, or its state of advancement from the raw state to a condition of refinement, is desirable as a dutiable standard, let it be so declared by the laws ; and then the merchant will know on what he has to depend.  Uncertainty and ambiguity are the bane of commerce.  Discretion in the custom-house officer should be limited as strictly as possible.  It has been said with much truth, "Where law ends, tyranny begins."

It is argued that, although the Dutch standard of color is named in the statute, yet the intent of the law was to adopt it as a standard of quality ; and if, in consequence of changes in the mode of manufacture, it ceases to be such, the reason of the law ought to prevail, and quality ought to be still the test. And that quality was the object sought is inferred from the language of sects. 2914 and 2915 of the Revised Statutes.

This reasoning would be very good if the law prescribing the standard were not explicit in its terms.  Whatever may have been in the minds of individual members of Congress, the legislative intent is to be sought, first, from the words they have used.  If these are clear, we need go no further ; if they are obscure or ambiguous, then the intent may have to be sought out by reference to the context, to previous or concurrent enactments, to the history of the art or trade, to general history, to anything that will throw light on the meaning of the obscure or ambiguous terms used.  But there is no obscurity or ambiguity here.  Two tests for fixing the dutiable grade of sugars were open to the legislative choice, — that of color and that of constitution or chemical quality.  Congress chose the former.  It is not strange that it did so : the color test had long been used, and it was well calculated to designate quality in the old sugars, manufactured in the old way.  But in making its election, Congress did not leave any room for doubt as to its meaning.  It used apt terms to express it : terms free from all ambiguity and obscurity.  If the test adopted fails to effect the desired object, the inconvenience, or loss to the treasury, need only be temporary : it can be changed at any moment.  And it is better to submit to a temporary inconvenience than to set the laws all afloat by laying down a canon of construction which leaves the plain words, and seeks to spell

out, or guess at, the supposed intent of the legislature, contrary or supplementary to that which is clearly embodied in the words it has used.

We see nothing in the sections referred to to change this plain and simple view of the subject. Sect. 2914 merely directs that the standards to be used by the collectors shall be furnished by the Secretary of the Treasury. This was to insure certainty and uniformity in the selection of the Dutch standards. The evidence shows that the Secretary performed this duty by procuring the standards from the proper parties at Amsterdam, and furnishing them to the collector. They were exactly the same, however, as those procured by private dealers. It cannot be justly contended that this section authorized the Secretary to adopt a different standard from that prescribed by Congress; to. wit, a standard of chemical constitution indicated by a polariscope, instead of a standard of color indicated by the Dutch glass bottles, carefully sealed, graded, and numbered. This would be to give to the section an unnatural force, and cause it to overrule the primary section to which it was, a proviso. In like manner, when sect. 2915 authorizes the Secretary, by regulation, to require that samples from packages of sugar shall be taken in such manner as to ascertain the true quality of such sugar, there is no indication of an intent to change the dutiable standard adopted in the purview of schedule G. Even if it be conceded that the word "quality," as here used, has reference to saccharine purity or strength, the most that can be inferred is, that it was the aim of Congress, by this clause, to enable the officers to take samples from the packages in such manner as to secure a knowledge of their entire contents, in the interior and in every part, as well as on the surface; in other words, to see that there was no fraud in making up the packages. It was supposed that the true quality of an entire package could be ascertained by proper care in taking out the samples, — by the manner in which they were taken out. Whether the quality was to be ascertained by any other test than that of the color is not stated; and, if it was, there is no indication that a different standard from that of the Dutch standard of color, prescribed in the principal section, was to be used in fixing the amount of duty. It may have

been the object of sect. 2915 to detect the use of artificial coloring on the surface of the packages, applied after the sugar was manufactured and after the packages were made up. At all events, we think that there is nothing in either of these sections that modifies or qualifies the plainly prescribed standard by which imported sugars were to be graded and assessed for duty.

We have examined the prior legislation on the subject from the act of Dec. 24, 1861, c. 2, down to that of Dec. 22, 1870, c. 6, which is substantially reproduced in the Revised Statutes; but, without reviewing the laws in detail, it suffices to say that we find nothing in this legislative history to change or affect our views. The concession that Congress may have supposed that the Dutch standard of color would be a sufficient test of quality, answers all that can be deduced from the prior statutes. If experience shows that Congress acted under a mistaken impression, that does not authorize the Treasury Department, or the courts, to take the part of legislative guardians, and, by construction, to make new laws which they imagine Congress would have made had it been properly informed, but which Congress itself, on being properly informed, has not, as yet, seen fit to make. It may be that our tariff of duties is evaded by giving to sugars, in the process of manufacture, a low grade of color. If this be so, it is no more than every manufacturer does; namely, so to manufacture his goods as to avoid the burden of high duties, provided he can do it without injuring their marketability, or injuring it less than the duties involved. So long as no deception is practised, so long as the goods are truly invoiced and freely and honestly exposed to the officers of customs for their examination, no fraud is committed, no penalty is incurred. Heretofore, it has been thought desirable, in order to make sugars more marketable, to use artificial processes for bleaching them. The percolation of clay water through the mass was one of the means adopted. The sprinkling of refined syrups in the form of spray on the sugar in the centrifugals is another. If the manufacturer uses these bleaching processes in order to make his sugars more salable, why may he not omit to do so in order to render them less dutiable; nay, why may he not employ an extra quantity of molasses for that purpose? If after the sugars are manufac-

tured, especially after being put up in packages, coloring matter is artificially imposed, it might be a different matter. The sugars would then have a different color from that which belonged to them when manufactured. This might be held to be a fraud on the revenue. But it is unnecessary to decide this question in this case.

A better remedy than that of making a forced construction of the law is in the power of Congress. All that has to be done is, to change the law so as to reach the goods in their new form, if it is thought desirable to do so. If the law is found defective, let it be altered so as to attain the result desired.

The argument that the sugars in question are not " sugars " in the sense of the law, because the standard adopted by the law for fixing the grade is, as to the sugars in question, defective in its application, is too metaphysical to be of weight in the consideration of the question. They are sugars of commerce, and the complaint of the custom-house is, that they are better sugars than they appear to be.

We think that the decision of the court below was right, and the judgment is

*Affirmed.*


MR. JUSTICE MATTHEWS, with whom concurred MR. JUSTICE HARLAN, dissenting.

It seems not to be denied by the opinion of the majority of the court, as it was expressly conceded by the court below, that if an artificial color had been imparted to the sugar *after* its manufacture, by which it was made identical in appearance with the color of the sample of the Dutch standard of a particular number, below that with which it would have been classified but for such adulteration, the government would have been entitled to prove the fact, and exact duties according to the classification of sugar of equal grade in its natural color.

This admission is not gratuitous, but is required upon any just construction of the law. And yet I cannot perceive what difference there ought to be if, during the process of manufacture, the same color is artificially produced by foreign matter, not necessary to the production of the sugar, and introduced for the express purpose of counterfeiting a color of a lower grade,

in order to evade the law and escape the duties imposed by it. This is precisely what the plaintiff in error offered to prove on the trial, and what, by the rulings of the court, he was not permitted to do. In my opinion, this was error, for which the judgment should be reversed.

The admission that it would be unlawful to produce artificially the color of the Dutch standard, after manufacture, to disguise the grade of the article, is inconsistent with the proposition that the color of that standard, as a visual impression, is the sole ground of distinction for rating duties on sugar; and yet that proposition is the only foundation that supports the judgment of the court below.

The phrase "No. 7 Dutch standard in color," and other similar phrases in the act of Congress, were not, in my opinion, intended to establish mere sensible color as the test for distinguishing the grades of sugar, for the purposes of the act; so as to embrace every description of sugar that could not, by the unaided eye, be differentiated in color from the sample. If so, sugar of the highest grade in other respects might be painted on the surface of its grains, after its manufacture was complete, without affecting its nature or quality commercially as sugar, so as perfectly to imitate an article of inferior strength and value, whose color had been naturally produced, and thus be imported at a lower rate of duty than would otherwise be lawful. For if mere color is the sole test to be regarded at the custom-house, as it may be determined by the eye alone, on comparison with the color of the standard, the officer has no right to inquire when or how the color was produced, so that it does not destroy the commercial character of the article. If the article is, and continues to be, sugar, and corresponds in color with the color of the sample used as the standard, it is to be rated accordingly.

A color imparted to sugar artificially, either during the process of manufacture or after its completion, and which it would not contract by means of any of the processes necessary merely to the production of sugar, is, in my opinion, not its natural color, and not the real and true color of the Dutch standard, however closely it may resemble it, or however impossible it may be, by sight merely, to distinguish it from the

color of the sample. It is a mere imitation and counterfeit of the Dutch standard in color ; for that means, not merely an abstract color, of a certain hue, but a concrete color inhering in, and belonging only to, sugar when produced according to the processes which, in the Dutch standard, result in differences of color, according to differences in the quality of the sugar itself. Congress, by the use of the phrase in question, intended to refer to color as resulting from and indicating a certain quality of sugar, considered in reference to its strength and corresponding value ; and hence used words, not descriptive of color, in reference to the various hues into which the ray of light is divided by the differences of refrangibility as it passes through the prism, and which are represented as primitive colors to the human eye, and designated by their associated names. Congress did not mean to scale the duty, as the sugar might be considered, according to such a standard, light yellow, yellow, dark yellow, light brown, brown, dark brown, &c. It meant to divide sugars for purposes of duties, according as they corresponded with certain samples of other sugars, produced according to a certain known mode of manufacture and designated in commerce, as well as in the statute, as of the Dutch standard, and classified by numbers, according to a gradation of color, resulting from that mode of manufacture, and not otherwise. So that to correspond with the color designated as a particular number of the Dutch standard, the sample produced must have, to the sight not merely a color so like it that the eye cannot distinguish between them, but the resemblance must be, in all respects, such that it is manifest that it is not a mere similarity by reason of imitation, but an identity of color, because it has resulted from the necessary processes of the manufacture, and belongs, by necessity of its nature, to the sugar itself, and not to a foreign ingredient, mixed with it as a coloring matter. In other words, sugar which is classed as No. 7, Dutch standard in color, must be sugar of that quality in other respects, which, in the Dutch standard, has a color known as No. 7.

For these reasons I feel compelled to dissent from the opinion of the court.