UNITED STATES *v.* INTERNATIONAL FORWARDING Co. (No. 2768)[1]

---

[1] T. D. 42235.

United States Court of Customs Appeals, May 27, 1927

Charles D. Lawrence, Assistant Attorney General (Hugo P. Geisler, special attorney, of counsel), for the United States.

Comstock & Washburn (J. Stuart Tompkins of counsel) for appellee.

[Oral argument December 14, 1926, by Mr. Lawrence and Mr. Tompkins]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

BARBER, Judge, delivered the opinion of the court:

Paragraph 1111 of the Tariff Act of 1922, aside from the last part which provides for varying rates of duty, is as follows:

Blankets and similar articles, including carriage and automobile robes and steamer rugs, made of blanketing, wholly or in chief value of wool, not exceeding 3 yards in length, * * * valued at not more than 50 cents per pound, 18 cents per pound and 30 per centum ad valorem; * * *

The merchandise in this case consists of rectangular articles of blanketing material, made of wool, imported in lengths varying from 4 to 4½ and 5 yards. Exhibit 1, introduced as a sample of the importation, is about 13 feet 6 inches long and 5 feet 3 inches wide, of a grayish color, except that there are four black stripes, each about 4 inches wide, extending across the article at right angles to its length. Two of these stripes are about 8 inches, and about 5 feet and 9 inches, respectively, from one end, and the other two are like distances, respectively, from the other end, resulting that the two stripes farthest from the ends are within about 16 inches of each other. If the exhibit is folded in the center, the fold comes about midway between the two last-mentioned stripes. The ends are unbound.

The method of its manufacture was described by the only witness in the case, who was called by the importer, as follows: Asked if "Exhibit 1 is not made into bolts," he said: "It is at the factory; it is made into one continuous chain, and they are chopped off. There are raw edges on the blankets." This testimony in connection with the exhibit leads to the conclusion that each imported article is a part of a longer web or bolt of blanketing on which appear at intervals of about 4 feet and 9 inches two of these black stripes 16 inches more or less apart.

The collector assessed the merchandise under paragraph 1111 on the theory that each article was two single blankets "attached in pairs." Importer protested, claiming classification under paragraph 1119 of the act as a manufacture of wool not specially provided for. The Board of General Appraisers, now the United States Customs Court, sustained the protest. The Government appealed.

The real question is whether an article like Exhibit 1 is one blanket or two blankets. The Government contends that it is two; importer that it is one. If it be regarded as one blanket, it is more than 3 yards in length and, therefore, excluded from the paragraph. If it be two blankets, each would be less than that length and, therefore, within it. But there is nothing whatever about the article that indicates that it is to be made into two blankets or anything else. No threads have been dropped, nor is there any line of demarcation to indicate where it is designed to be cut. The stripes are apparently for ornamentation. If the article were all one color, the claim that it was two separate blankets would be equally tenable. The question is not what the merchandise may be made into after importation, but what is it as imported. The Board of General Appraisers has explicitly found that the typical sample is one blanket.

The relevant part of the testimony of the witness in addition to that already referred to, was, in substance, that Exhibit 1 is "one complete blanket;" that he sold them at wholesale and retail; that there was no marking to indicate where it was to be cut. Asked if he sold them as a pair of blankets, he said: "Yes, I suppose they would be." Further asked if the exhibit was a pair of blankets he said: "I suppose that term is used." He further testified that about one-half of these blankets that he handled was made into clothes, cut up into a coat and the balance used in trousers; that in selling it as a blanket he sold it as an entity, and cut up—"both ways;" that he usually sold it as it is, as a single blanket; that there was no line of demarcation where it could be cut, except where it was folded; that it was one single piece; that he never cut them but tore them in half anywhere; asked if he had not said he sold them as a pair of blankets, he answered: "Yes, as it is ;" that he made sport coats, trousers, and lumber-jack shirts out of them; that he also bought bolts of cloth to make into clothing; that blankets like the exhibit were sold mostly to campers and sportsmen.

We think this testimony in connection with Exhibit 1 fully supports the finding of the board. There is no statutory definition of the word "blanket," and Exhibit 1 is clearly within the common meaning of that word as defined by lexicographers. All in substance agree that a blanket is an oblong piece of soft, loosely-woven cloth (more often wool), used for the sake of its warmth, perhaps, chiefly, as one of the coverings of a bed. There is no proof of commercial designation.

Paragraph 1111 fixes the limitation as to the length of blankets that shall be classified thereunder, and the language employed indicates that Congress understood there might be blankets of more than 3 yards in length. If so, they must be classified elsewhere.

There is no claim of any subterfuge for the purpose of evading or avoiding the proper classification of these blankets. If it be assumed that they are suitable and designed, after importation, to be made into two smaller ones, or that, in fact, they serve the purposes of two separate blankets, the classification, nevertheless, must depend upon their condition when imported. In the absence of disguise or artifice to prevent the proper classification of these blankets, it was the right of importer to bring them into this country in that form which was subject to the lowest rate of duty. *United States* v. *Citroen,* 223 U. S. 407 at 415; *Merritt* v. *Welsh,* 104 U. S. 694 at 704.

In the latter case the Supreme Court, referring to the claim that importers made sugar of a darker color to evade a higher rate of duty, said:

If this be so, it is no more than every manufacturer does, namely, so to manufacture his goods as to avoid the burden of high duties, provided he can do it without injuring their marketability or injuring it less than the duties involved.

The Government undertakes to liken these blankets to fabrics imported in running lengths, with figures or designs repeated at intervals throughout the entire fabric, claiming, in effect, that these are single blankets imported in the piece, citing among others, the cases of *United States* v. *Buss,* 5 Ct. Cust. Appls. 110; *Artistic Weaving Co.* v. *Maguire,* 13 Ct. Cust. Appls. 140; and *Rogers* v. *United States,* 14 Ct. Cust. Appls. 51, T. D. 41552. These cases, however, do not sustain the Government's contention.

In the *Buss* case the subject was carefully reviewed and it was held that where small articles were not produced as individual or separate products of the loom but, for economy of manufacture, were first woven in the piece, the rule was, in case there was nothing to be done to such articles except to cut them apart, that they should be treated for dutiable purposes as if already cut apart and assessed according to their individual character or identity. It was said:

This follows, however, only in case the character or identity of the individual articles is fixed with certainty and in case the woven piece in its entirety is not commercially capable of any other use.

In the *Rogers* case, last above cited, the rule in the *Buss* case respecting the dutiability of articles woven in the piece was approved, and it was held that certain merchandise known as "woven upholstery fabrics," imported in long running lengths, was not within the rule of the *Buss* case because such fabrics were commercially capable of more than one use.

Clearly the blankets here are not within that rule. They are not imported in long running lengths. They are not so made that the identity of two separate blankets is fixed with certainty. In addi-

tion to that, the record shows that some 50 per centum of these blankets are used in making garments.

In this connection see *Snow's United States Sample Express Co.* v. *United States*, 8 Ct. Cust. Appls., 17, in which certain cotton cloth, so printed as to be capable by cutting between designs of being converted into bed spreads, curtains, table or couch covers, was held to be cotton cloth and not articles, because it was not so far advanced that it had an individuality which identified it in its unfinished state as it would be when finished.

The Government further contends that these blankets, if not classifiable under paragraph 1111, are properly dutiable under paragraphs 1108 and 1109 of the act, which provide for woven fabrics, wholly or in chief value of wool, of two kinds, one weighing not more than 4 ounces per square yard and the other for such fabrics exceeding that weight. As to this claim, we agree with the board that as the importations are blankets—that is, distinct entities—they have passed beyond the character of woven fabrics and therefore fall within the provision for manufactures wholly or in chief value of wool, not specially provided for.

The Government makes other contentions, asking us to take judicial knowledge of certain facts, all which it is unnecessary to mention further than to say that such facts, so far as we can take judicial knowledge of the same, do not affect our decision here. So far as we can not take cognizance thereof, if they were important, it was for the Government to establish them by proof, which it has failed to do.

The judgment below is *affirmed*.