CORPORACION ARGENTINA DE PRODUCTORES DE CARNES *v.* UNITED STATES (No. 4483)[1]

---

[1] C. A. D. 304.

United States Court of Customs and Patent Appeals, March 5, 1945

Barnes, Richardson & Colburn (J. Bradley Colburn of counsel) for appellant.

Paul P. Rao, Assistant Attorney General (Alfred A. Taylor, Jr. and Joseph F. Donohue, special attorneys, of counsel), for the United States.

[Oral argument February 6, 1945, by Mr. Colburn and Mr. Donohue]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The importer has here appealed from a judgment of the United States Customs Court, Third Division, overruling its protest against the assessment and collection of duties on certain dog food imported from Argentina. The merchandise, consisting of a large quantity of 1-pound and 6-pound cans of mixed dog food, entered in the year 1940, was assessed by the collector at the port of New York with a duty of 20 per centum ad valorem as a nonenumerated manufactured article under paragraph 1558 of the Tariff Act of 1930.

Appellant protested the said classification and assessment of duty and claimed the merchandise to be dutiable at 10 per centum ad valorem under paragraph 730 of said act, directly or by similitude (by reason of paragraph 1559), as mixed feeds, or at 5 per centum ad valorem under said paragraph 730 as modified by the trade agreement with Canada, T. D. 49752.

The pertinent statutory provisions read as follows:

PAR. 730. Bran, shorts, by-product feeds obtained in milling wheat or other cereals, 10 per centum ad valorem; hulls of oats, barley, buckwheat, or other grains, ground or unground, 10 cents per one hundred pounds; dried beet pulp, malt sprouts, and brewers' grains, $5 per ton; soy bean oil cake and soy bean oil-cake meal, three-tenths of 1 cent per pound; all other vegetable oil cake and oil-cake meal, not specially provided for, three-tenths of 1 cent per pound; *mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs, 10 per centum ad valorem.* [Italics ours.]

Par. 730 (as modified by the Canadian Trade Agreement).

| Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| 730 | Mixed feeds, consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs_____ | 5% ad val. |

PAR. 1558. That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated or provided for, a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

The importer introduced the testimony of two witnesses, the Government that of one. The Government's witness testified in regard to a partial chemical analysis of a sample of the imported merchandise. Four documentary exhibits, which will be referred to hereinafter, were also introduced.

The collector's report states that the chemical report showed "5.8% grain products calculated as corn meal," and, for liquidation purposes, the collector adopted the description of the merchandise suggested by the appraiser, i. e., "mfd. articles nspf at 20% under paragraph 1558 of the Tariff Act of 1930."

There is sharp conflict between counsel for the respective parties as to the grain content of the imported dog food, the Government relying wholly upon the report of Isadore Schnopper, chemist of the division of laboratories of the Customs Bureau, who found by a starch test that the small sample from one of the cans which he examined contained 5.8 per centum grain products. Mr. Schnopper assumed that the grain was corn meal. He arrived at his conclusion by multiplying the percentage of starch by two. There is some criticism of this means of arriving at the grain content, and some doubt is thrown upon the actual grain content of the mixture by the testimony of appellant's witnesses and the documentary exhibits which are intimately connected with the collector's action; but, for reasons hereinafter stated, it will be necessary to accept the Government witness' figures for the purpose of decision.

. Prior to the importation, the appellant company, through Carlos Garcia Mata, the manager of its New York office, who was interested in importing from Argentina various kinds of packing-house products, ascertained from the Customs Bureau what percentage of grain or grain products was required in imported, ready-to-serve dog food to comply with the views of the customs officials as to its dutiability under said paragraph 730. The exhibits show that after considerable correspondence, the Bureau of Customs was of the opinion, and so instructed the customs officials, that imported dog food, consisting of meat, grain, etc., must contain at least 8.6 per centum of grain or grain products in order to be classifiable under paragraph 730, as modified by said trade agreement. It further instructed the collectors that the food should be unfit for human consumption in its imported condition and ready to use as food, not merly a material to be used in making feeds, and that it was not necessary that the grain products be the component material of chief value, but that the mixture should contain a substantial quantity thereof. This substantial quantity was fixed at 8.6 per centum.

The testimony of appellant's two witnesses, said Mata and Milton Leroy Goff, Jr., of Goff-Hopkins, Inc., importer of dog food from Argentina, is to the effect that pursuant to their understanding of the requirements of the customs officials with reference to the quantity of

grain or grain products in imported dog food from Argentina, Mr. Goff, after extended investigation and research throughout the United States, prepared a formula, which was transmitted to Argentina for guidance in manufacturing the imported dog food such as is involved here. Mata and Goff visited the scene of manufacture in Argentina and observed the preparation of dog food of the same brand as that involved here, namely, "White Label Brand." They testified that they witnessed the said preparation, that it was in accordance with instructions and formula; and that the mixture contained *82 per centum beef, 9 per centum cereal, 3 per centum carrots, 3 per centum spinach, and 3 per centum brewers' yeast.* Mata testified specifically that he saw what he termed the sample cans made in Argentina; that the mixture contained the aforesaid ingredients; that it was of the utmost importance that the dog food imported from Argentina should all be made in accordance with the formula; and that he had no reason to suspect that the instant imported merchandise, which he *had not analyzed and had not seen prepared,* did not meet the full requirements of the formula. It was therefore his belief, based upon the facts aforesaid, that the imported merchandise contained 9 per centum cereal, which was in the form of corn meal. Goff said that such dog food had been "practically uniform the entire time" he had been importing it.

The trial court held, after discussing the evidence which we have in part summarized, that the only evidence as to the grain content is found in the testimony of the Government chemist, and it accepted as an established fact that the grain content of the imported merchandise was 5.8 per centum.

We cannot say that the trial court's holding with reference to the cereal content of the imported merchandise was contrary to the weight of the evidence. Therefore, as a basis for decision, we proceed to determine whether the imported dog food, consisting of 82 per centum meat, 5.8 per centum cereal, 3 per centum carrots, 3 per centum spinach, 3 per centum brewers' yeast, and 3.2 per centum of undetermined components (obviously composed of one or more of the last three named ingredients) should be regarded as mixed feeds under the controverted provision. Aside from the question of cereal content the character of the other ingredients is not seriously contested, and, in view of our conclusion, we think it is immaterial to consider that phase of the question.

As we understand the position of the Government, it is, first, that the said instruction of the Bureau of Customs is a reasonable one and has not been complied with in respect of the cereal content, and that 5.8 per centum grain or grain products in dog food is not a substantial quantity. It additionally argues in this connection that the paragraph is "predominantly" a grain or grain products paragraph, and that grain or grain products should predominate over meat or other feedstuffs. However. we think that the Government. on this

phase of the case, relies principally upon the contention that 5.8 per centum grain product (corn meal) is not substantial. Second, it contends that the importer has not shown that the imported merchandise is unfit for human consumption, and that the trial court's holding with respect thereto was proper. Third, it argues that the term "admixture of grains or grain products" requires that there be more than one grain or grain product, and that since admittedly the imported material contains the product of but one grain, it does not comply with the terms of the provision. Fourth, it argues that to classify the instant imported product, consisting of 82 per centum meat and 5.8 per centum grain product, etc., violates the rule of *ejusdem generis*.

As to the Government's first contention—that the requirement of the Bureau of Customs that grain content be at least 8.6 per centum is a proper one—it might be sufficient to say that the statute does not so require. We say this without condemning in the least the attempt of the Customs Bureau to establish a yardstick so as to advise collectors and bring about uniform decisions, by suggesting the quantity of grain or grain product it regards as substantial. That is what we understand it did, but it is too obvious to admit of extended discussion that the Customs Bureau has no authority to make such a line of demarcation have the effect of law.

Counsel on both sides were cognizant at all times during the briefing and argument of the instant appeal that this court had very definitely expressed its views (on an issue in many respects quite similar to the one now under consideration) which we think are controlling of decision here, in the case of *B. Westergaard & Co. v. United States*, 19 C. C. P. A. (Customs) 299, T. D. 45469. So, the Government states very positively that the principal issue here is whether 5.8 per centum grain products "constitutes a substantial amount sufficient to bring the product within the mixed feeds provision."

In the *Westergaard* case this court had under consideration fish balls, fish cakes, meat balls, and meat cakes, all of which contained potato flour in the following respective proportions: 3⅓ per centum, 3½ per centum, 6 per centum, and 6 per centum, which merchandise was claimed to be dutiable under the vegetable paragraph 773 of the Tariff Act of 1922 and under the particular provision thereof for "balls * * * and all similar forms, composed of vegetables, or of vegetables and meat or fish, or both." Incidentally, it will be noticed (in view of that which follows herein) that that paragraph called for "vegetables" in the plural. The question presented there was whether or not the merchandise containing potato flour in percentages ranging from 3⅓ per centum to 6 per centum had sufficient vegetable content to warrant classification under the controverted provision. Tersely stated, this court there held that the potato flour, although a vegetable,

was not present in sufficient quantities to warrant classification of the merchandise under the vegetable paragraph, principally because said flour was not used for any other purpose in the cakes and balls than the mechanical purpose of holding the material together during the cooking and sterilizing processes, and that it did not add a vegetable character to the merchandise.

It was there said that the paragraph was "essentially a vegetable paragraph." The court held that in order for the vegetable content of such balls and cakes to bring the same within the purview of the paragraph, the quantity should be substantial. We relied in part upon legislative history, which is absent from the case at bar. We said:

In view of the small percentage of potato flour present and its function we are of opinion that its quantity is insufficient to give the involved cakes and balls the character of vegetables with fish or of vegetables with meat within the purview of paragraph 773.

It may be that in reading paragraph 730 as a whole, one would conclude that most of the articles named therein relate to grain or grain products, or mixtures of the same; but the provision for mixed feeds, "consisting of an admixture of grains or grain products with oil cake, oil-cake meal, molasses, or other feedstuffs," obviously cannot be regarded as so essentially a grain or grain products provision as to require any particular percentage of either grain or grain products or other feedstuffs, so long as the percentage is substantial. It was within the province of Congress to say what amount of grain or grain products mixed feeds should contain. It did not say what the Government now says—that the grain or grain products should predominate or that it should be present in any specified quantity. In the paragraph in controversy in the *Westergaard* case, there was no hint that the involved provision should require a predominance of any of the component elements; and this court there laid down the rule, in substance, that although the paragraph was essentially a vegetable paragraph as a whole, it was only necessary that the fish and meat forms should contain a substantial proportion of vegetables. The function of the potato flour in the mixture in that case was a controlling factor.

The testimony in the instant case shows—and the facts in this regard are not disputed—that dog food of this character, such as the well-known brands, "Red Heart" and "Pard," which are mentioned and discussed in the testimony, contains cereal for a definite purpose. That purpose, as stated by the witness Goff, is to hold the meat, the most important food element of the mixture, in the dog's stomach for a longer period of digestion, it being understood that, unlike human beings, but little of the dog's digestive processes takes place in the mouth, and that meat alone quickly passes from the stomach. Cereals also contain food calories and vitamins and are a necessary part of

a dog's diet. The testimony also shows that brewers' yeast and such vegetables as carrots and spinach have one quality not possessed by cereals or meat to a satisfactory degree in the way of supplying certain needed vitamins, although they do supply some of the desirable qualities of cereals. The record indicates that dog food of the kind described, possessing the other undisputed ingredients and 5.8 per centum cereals is a complete dog food, ready to use without further processing or mixing, and that it compares favorably with other well-known dog foods and furnishes the animal a complete and satisfactory diet. Therefore, it appears from the evidence that 5.8 per centum of corn meal serves a definite and satisfactory food purpose. For this reason, it is in a quantity that cannot be ignored, and we think it is substantial.

The Government, in contending that the paragraph is essentially a grain paragraph and in urging that grain should predominate, would seem to imply that no dog food known to commerce could meet the requirements of the paragraph. It urged here (with apparent lack of enthusiasm) that the term "other feedstuffs" is not met by an article which has 82 per centum meat or meat products. This argument as a whole goes to the effect that no satisfactory mixed dog food known to commerce was intended by Congress to find classification in the controverted provision.

Surely it cannot be logically contended that Congress contemplated, in the use of the term "feedstuffs," the exclusion of meat and meat products. It is a matter of common knowledge that imported and domestically produced tankage, cracklings, bone meal, and several other well-known feedstuffs are of animal origin and form a part of animal feeds. Meats or meat products are used in making mixed feeds for dogs, fur-bearing animals, hogs, and poultry. There is no reason to believe that Congress sought to make a low rate of duty on feedstuffs and to exclude dog food, if it contained a substantial amount of grain or grain products and other feedstuffs. The feeding of dogs in the United States is not such an inconsequential or insignificant matter as to have failed to receive the attention of the legislature in passing the mixed feed provision. However, it is not seriously urged by the Government, except in the manner aforesaid, that dog food is not provided for in the controverted paragraph. That issue need not be belabored further, although the exhibits and various literature, such as a magazine under the title *Feedstuffs* and many other pertinent authorities, afford abundant support for concluding that the term "feedstuffs" in the United States includes feeds for dogs, fur-bearing animals, poultry, etc., which often include meats and meat products in large quantities.

The lexicographers have afforded us no definition of "feedstuffs," although the meaning of the words "feed" and "stuff" are defined and

well understood. The best definitions of the terms "mixed feeds" and "feedstuffs" with which we have been made acquainted, are in War Food Order 99, 9 Fed. Reg. 5016, where these terms are defined as follows:

"Mixed feed" means any mixture or combination of two or more natural or artificial feedstuffs used or intended for use in feeding livestock, poultry, fur-bearing or other animals.

"Feedstuff" means any material or substance used or intended for use in the feeding of livestock, poultry, fur-bearing animals or other animals for any purpose whatever.

It is not without interest to note that since 1935 (the earliest year available) the Department of Commerce, in preparing statistics, which are used for many purposes, relating to domestic production, imports, etc., of "Mixed feeds," includes therein the facts relating to dog foods. See "Second Trade Agreement between the United States and Canada—Digests of Trade Data with respect to Products on which Concessions Were Granted by the United States," Vol. III, Part 1, p. 7–114 (U. S. Tariff Commission).

In defining commercial "feeding stuffs," the Court of Appeals of New York, in *Pine Grove Poultry Farm* v. *Newtown By-products Mfg. Co.*, 248 N. Y. 293, 162 N. E. 84 (a leading and oft-cited case on a question not involved here) held that the term "feeding stuffs" included meat scraps procured from various butcher shops, seasoned, ground, and sifted through a screen. This case is of interest here only in that it illustrates what ordinarily is considered as within the meaning of the term "feedstuffs," although it is noted that in that case the meaning of the term "feeding stuffs" was involved. The two terms, however, would seem to be synonymous.

Some of the authorities we have above referred to go extensively into the characteristics of various feedstuffs and give facts and figures concerning the manufacture, sale, and value of such products as feeds for animals, which include several meat products.

As to the holding of the trial court and the second contention of the Government that it was necessary for the importer to show that the instant merchandise is not fit for human consumption, we are of the opinion that the importer has done so, although we do not regard it as an essential requirement under the circumstances of this case. This merchandise, according to the record, is produced, imported, and sold exclusively for dog food. The record shows that it has no salt and is not desirable as a human food. One witness stated that if one ate it once, he would never eat it again. It is too obvious for extended discussion that the instant merchandise is a dog food and falls within the term "feedstuffs" intended for animals. Of course Congress did not contemplate that the term "feedstuffs" should include that which ordinarily is food for human beings. Human beings eat molasses, but usually the molasses that goes into mixed

feeds would be that which would be undesirable for human use, but suitable, by reason of certain qualities possessed, to form a part of mixed feeds for animals.

Furthermore, on this question, wherever Congress wanted to provide for a thing that was unfit for human consumption, it usually said so. If a mixture were fit for human consumption and were so used and usually so regarded, it could hardly find lodgment in a mixed feeds provision. Congress, in paragraph 729, provided for "wheat, unfit for human consumption"; in paragraph 1677, for "Fish imported to be used for purposes other than human consumption"; in paragraph 1780, for "Tankage, fish scrap, fish meal, cod-liver oil cake, and cod-liver oil cake meal, all the foregoing unfit for human consumption." In paragraph 730, Congress used the words "oil cake," "oil-cake meal," "molasses," and "feedstuffs" without qualification. We think the trial court was unwarranted in basing its decision in part upon the fact that it found that the importer had not proved that the imported merchandise is unfit for human consumption.

As to the third contention of the Government—that the term "admixtures of grains or grain products" requires that more than one grain or grain product be included in the mixture—we think it is wholly without merit. This is inferentially disclosed in the *Westergaard* case, *supra;* and a consideration of the context of paragraph 730, as a whole, is sufficient to suggest the unsoundness of this contention. The first part of the paragraph, not quoted by either of the parties here in their briefs, provides for "Bran, shorts, by-product feeds obtained in milling wheat or other *cereals."* [Italics ours.] Could it be logically contended that "other cereals" requires that there be more than one cereal milled? The next provision is for "hulls of oats, barley, buckwheat, or other *grains,* ground or unground." [Italics ours.] Should it be required that the hulls of two or more grains be ground together? Congress used the term "admixture of grains or grain products" in the same sense. Obviously, if there were 82 per centum of corn meal in the merchandise at bar and 5.8 per centum meat, the Government would not be contending (but if so, it would be illogical) that there must be more than one grain ground together to make the mixture. The provision is satisfied if the product consists of a mixture of a substantial quantity of any one grain or grain product with other feedstuffs.

Lastly, the Government's fourth argument relates to *ejusdem generis.* The rule which requires that, in determining the classification of an imported article under a general clause which follows specifically enumerated articles, they all should be regarded as of the same class, we think, cannot be urged as a controlling consideration here. The specific enumerations preceding the general clause "or other feedstuffs" are oil cake, oil-cake meal, and molasses. It would

seem there is about as much difference between molasses and oil cake or oil-cake meal as there is between a mixed meat, cereal, and vegetable product and molasses. In other words, the enumerated articles belong to no single general class, except insofar as they are feedstuffs. Furthermore, oil cake and oil-cake meal, like the product at bar, have an oily or fatty characteristic which is desirable in some kinds of mixed feeds.

In support of its contention that the quantity of meal in the imported merchandise is not substantial, the Government has cited no cases other than the *Westergaard* case, *supra*. The trial court, however, did call attention to one case which we think requires consideration, *Union Supply Co.* v. *United States*, 67 Treas. Dec. 631, T. D. 47645, which, according to the decision below, was relied upon there by the Government (though it is not relied upon here). That case was a decision by the Customs Court, wherein a cooked mixture of ground pork, 95.71 per centum, and whole green peas, 4.29 per centum, was involved. It was there held that the pea content was not substantial, and that therefore the merchandise was not within the vegetable paragraph 775. The court, however, said: "The record here is silent as to the function of the peas in the instant commodity."

Not only is it true in the instant case that the quantity of cereal is 5.8 per centum and that, under the proof, it serves a definite, useful purpose in dog food, but no suggestion is offered by this record that the meal in appellant's goods was added by "disguise or artifice to prevent the proper classification of" the merchandise. *United States* v. *International Forwarding Co.*, 15 Ct. Cust. Appls. 198, 201, T. D. 42235. Appellant, according to the record, not only sought to add a desirable, and what seems to be a necessary, ingredient of dog food but also was careful to try to add that quantity which was regarded as substantial by the customs officials. Certainly an importer, in the absence of subterfuge or deceit, has the right to so fashion his merchandise that he may obtain a lower rate of duty than if not so fashioned. *Merritt* v. *Welsh*, 104 U. S. 694, 701, 704.

Our attention is called by the importer to *Godillot* v. *United States*, 1 Ct. Cust. Appls. 239, T. D. 31275, where cherries in maraschino were packed in sealed bottles or tins in a light sirup or sugar containing alcohol varying from 3.1 per centum to 5.45 per centum. This court, in affirming the holding of the lower court to the effect that the merchandise was fruits preserved in spirits, stated:

It can not be said therefore of alcohol present to the extent of 5 per cent of the importation that it is an insignificant quantity. It answers a purpose, and a material purpose, in preserving the fruits for a sufficient length of time to enable the purchaser to make use of them, which would not be true if the alcohol were not present.

It is most difficult to undertake to draw a dividing line based upon the percentage of alcohol present. We think, however, that in the present case there was a

sufficient quantity of alcohol in all these importations to serve a purpose in preserving the fruit so that after being opened the fruit could·be used in the ordinary course without fermentation. It served a'purpose, therefore, of preserving the fruit, and the fruit was preserved, in that sense at least, in spirits.

We think that case is quite in point on one phase of the instant appeal.

We think it important to note also the holding in two other cases. In *Aetna Explosives Co.* v. *United States*, 9 Ct. Cust. Appls. 298, T. D. 38238, 80 per centum of nitric acid mixed with 20 per centum of sulphuric acid was not regarded as a chemical mixture, although both articles were chemicals, because the 20 per centum of sulphuric acid served no purpose except to prevent the nitric acid from damaging the tank cars in shipments from Canada. This confirms the soundness of our holding in the *Westergaard* case, *supra*, and in the instant case. In the *Westergaard* case, the potato flour served no purpose contemplated by the law. Here, the 5.8 per centum of corn meal serves such a purpose.

In *United States* v. *Thomas & Co.*, 15 Ct. Cust. Appls. 295, T. D. 42473, a mixture of 95 per centum linseed oil and 5 per centum soybean oil was held to be a mixture of oils, under a·specific provision for "mixtures of * * * oils" rather than linseed oil, although it served the same purposes as linseed oil, it not, however, being a good delivery for the latter. The court held that the maxim *de minimis non curat lex* did not apply, and that the 5 per centum of soybean oil served a real purpose in the future use of the mixture and was not a mere carrier or used for a mechanical purpose. So here, the 5.8 per centum of corn meal serves a real purpose in dog feeding.

On the question of the 5.8 per centum meal being a negligible quantity to be ignored under the said *de minimis* rule, as applied to the construction of a tariff act provision, see *Rothschild* v. *United States*, 179 U. S. 463, 470. Also see *United States* v. *Mandel*, 1 Ct. Cust. Appls. 223, T. D. 31259; *Vandegrift & Co.* v. *United States*, 3 Ct. Cust. Appls. 176, T. D. 32462; *Bemis Bro. Bag Co.* v. *United States*, 11 Ct. Cust. Appls. 373, T. D. 39162; *United States* v. *James G. Kitchen & Co.*, 17 C. C. P. A. (Customs) 265, T. D. 43688; *Cosmos Textile Corp.* v. *United States*, 21 C. C. P. A. (Customs) 124, T. D. 46449. Cf. *United States* v. *Bryant & Beinecke*, 10 Ct. Cust. Appls. 79, T. D. 38355.

The respective .parties in the proceeding have devoted much space in their briefs and time in their oral arguments to a discussion of the question of the applicability of the similitude paragraph. In view of our conclusion, however, that the merchandise is dutiable directly under paragraph 730, this interesting question requires no consideration here and may appropriately be reserved for future consideration when pertinent.

It follows from the foregoing that the trial court fell into error in overruling appellant's protest and in holding that the instant mer-

chandise was dutiable as a nonenumerated manufactured article under paragraph 1558. It should have sustained the claim that the merchandise is dutiable at 5 per centum ad valorem under paragraph 730, as modified by the said trade agreement. Its judgment is therefore *reversed.*